William P. Hickman and Audrey M. Hickman v. Commissioner. Atlas Groves, Inc. v. Commissioner.
Hickman v. Commissioner
Docket Nos. 7396-70, 7397-70.
United States Tax Court
T.C. Memo 1972-208; 1972 Tax Ct. Memo LEXIS 48; 31 T.C.M. (CCH) 1030; T.C.M. (RIA) 72208; September 28, 1972
*48 Atlas Groves, Inc., all of whose stock was owned by the Mary T. Hickman Trust, claimed an investment credit on its corporation income tax return for its fiscal year ended August 31, 1968, totaling $10,457.48, consisting of $3,817.80 for property acquired in that year and $6,639.68 of carryovers of unused investment credits from prior years in the aggregate amount of $6,740.74. Part of these investment credits arose from transactions with respect to certain citrus groves which Atlas had purchased from William and Audrey Hickman, the two beneficiaries of the trust. Respondent allowed an investment credit in Atlas' taxable year 1968 of $3,079.30, and disallowed investment carryovers of $7,378.18 claimed for that year. Held, the investment credit in dispute is not deductible by reason of sec. 267, I.R.C. 1954. 1031 Brian C. Ellis, 92 Lake Wire Dr., P. O. Drawer BW, Lakeland, Fla., for the petitioners. Robert W. Goodman, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent detemined deficiencies in petitioners' income tax as follows: Docket No. 7397-70
Year
Deficiency
1966
$ 3,867.86
1967
4,363.26
1968
12,306.39
Docket No. 7397-70
Year Ended
August 31
Deficiency
1963
$ 244.12
1964
188.98
1966
308.63
1967
30.72
1968
7,198.12
The sole issue presented for our consideration is whether William and Audrey Hickman owned more than 50 percent of the value of the outstanding stock of Atlas Groves, Inc., within the purview of section 267 of the Internal Revenue Code of 1954 which would preclude Atlas from the allowance *52 of certain investment credit claimed on its corporation income tax return for its fiscal year ended August 31, 1968. Findings of Fact Some of the facts have been stipulated and are so found and incorporated by this reference. The petitioners in docket No. 7396-70 are William P. and Audrey M. Hickman, husband and wife, who both at the time of trial and at the time their petition was filed resided at 109 Flora Drive, Haines City, Polk County, Florida. They filed their joint income tax returns for their taxable years 1966, 1967, and 1968 with the director of internal revenue at Chamblee, Georgia. Petitioner in docket No. 7397-70 is Atlas Groves, Inc. (hereinafter sometimes referred to as Atlas or petitioner), a corporation organized under the laws of the State of Florida on August 29, 1950, whose business address both at the time of trial and at the time its petition was filed was 109 Flora Drive, Haines City, Polk County, Florida. It filed its income tax returns for its taxable years ended August 31, 1963 to 1967, inclusive, with the district director of internal revenue, Jacksonville, Florida. It filed its income tax return for its taxable year ended August 31, 1968, with the *53 director at Chamblee, Georgia. The authorized capital stock of Atlas is 50 shares of $100 par value common stock, of which only five shares have ever been issued and are outstanding. William P. and Audrey M. Hickman (the Hickmans) were the sole stockholders of Atlas from the date it was incorporated until all of its outstanding stock was transferred to the trustees of the Mary T. Hickman Trust (the trust). On or about January 31, 1958, the Mary T. Hickman Trust purchased three shares of Atlas' stock from William P. Hickman (sometimes hereinafter called William) for $300 cash and two shares of such stock from Audrey M. Hickman for $200 cash. The trustees of the trust have held title to all of Atlas' outstanding stock since it was transferred to them. William is a certified public accountant and was employed in that capacity as a young man but has not been so employed in recent years except to prepare income tax returns for employees of Holly Hill Fruit Products Company. For most of his adult life, William has been engaged in some aspect of the citrus fruit industry, either as an officer of corporations whose business consisted of some aspect of that industry, or as the owner *54 of citrus groves. William has been president and treasurer of Holly Hill Fruit Products Company since about 1962, has been an employee of that corporation since 1932, and has been a member of its board of directors for over 25 years. During the taxable years involved, Holly Hill's business was that of managing and caring for citrus groves for its stockholders, picking and hauling citrus fruit, canning citrus products, and manufacturing citrus juice concentrate. In those years, its gross sales were approximately $10 million per year. During the taxable years involved, the Hickmans were major stockholders in Holly Hill, there being only two stockholders who owned larger amounts of its outstanding stock. In addition to his position with Holly Hill, William, during the taxable years involved, was president and treasurer of Ridge Citrus Concentrates, Inc., a corporation organized to secure citrus fruit for Holly Hill. 1032 William owned 50 percent of the outstanding stock of Ridge Citrus Concentrates, Inc., and the other 50 percent was owned by L. W. McKnight, the vice president of Holly Hill. The Hickmans have owned citrus groves at least since 1937. On January 2, 1957, William's *55 mother, Mary T. Hickman, created the Mary T. Hickman Trust. At the time the trust was created, Mary T. Hickman was over 80 years old. She died on October 8, 1957. William assisted his mother in creating the trust. The Hickmans are the two beneficiaries named in the trust instrument. Item III of the trust provides as follows: Item III. The co-trustees or their successors shall administer this trust for the following purposes: A. My trustees shall from time to time distribute to or for the benefit of my son William Pruett Hickman, and my daughter-in-law, Audrey Meeks Hickman, so much of the net income and such portions of the corpus of their respective trust shares as my trustees in their sole discretion may consider necessary or advisable for the support, medical care and general welfare of each such beneficiary taking into consideration all other income and cash resources known to my trustees to be available to each of such beneficiaries for such purposes measured by the standard of living to which they are accustomed at this time. All income not distributed to my said son or my said daughter-in-law shall be accumulated and added to the corpus of each separate trust. B. In *56 event of the death of either of my said son or my said daughter-in-law, the trust share held for his or her benefit shall be added to and become a part of the trust share held for the benefit of the surviving beneficiary, and such addition shall be administered under the same conditions and for the same purposes as the original two trust shares set up herein. Upon the death of the last to die of my said son and my said daughter-in-law, the trust estate held for the benefit of such surviving beneficiary shall be distributed to such person or persons in such portions and subject to such terms, trusts and conditions as such decedent beneficiary may appoint, without violating any applicable rule against perpetuities or accumulations, by specific reference to this power in the valid last will of such decedent beneficiary. Neither my son or my daughter-in-law shall have the power to appoint any share of the trust estate, held for the benefit of either one to himself or herself as the case may be to his or her creditors or to his or her estate or to the creditors of his or her estate. In event either my said son or my said daughter-in-law fails to effectually exercise such power of appointment, *57 then the share of the trust estate held for the benefit of such beneficiary shall be distributed to my then living heirs-at-law as if such property had belonged to me and I had then died intestate domiciled in the State of Florida. The survivor of the Hickmans is entitled to the benefits of the trust during his or her lifetime. The last to die of the Hickmans is granted the power to appoint the corpus of the trust. The testamentary power of appointment conferred on the survivor of William and Audrey Hickman by Item III B of the trust is, under their present wills, exercised by both of them in favor of J. Frank Hickman, William's brother, if he survives them, and if he predeceases them, in favor of his wife and his son. The Hickmans do not have, nor at any time have had, any children. The only presently living and ascertainable heirs-at-law of Mary T. Hickman are William P. Hickman and J. Frank Hickman. J. Frank Hickman was born on February 25, 1910. His son was born on August 6, 1930. Apart from the contingent right of the Hickmans to receive income or principal from the trust pursuant to Item III A of the trust agreement, they have no rights to receive either income or corpus *58 from the trust. No distributions of income or corpus have ever been made by the trustees of the trust to either William or Audrey Hickman. The original co-trustees of the trust, as set forth in the trust agreement, were William Hickman, S. J. Carter, and L. W. McKnight. On May 30, 1964, William Hickman and L. W. McKnight resigned as trustees of the trust and were succeeded by Audrey and Frank Hickman, brother of William, as successor trustees. From and after May 30, 1964, the three trustees of the trust have been S. J. Carter, Frank Hickman, and Audrey Hickman. L. W. McKnight is a long-standing business associate of William, they both having 1033 been employees of Holly Hill since the early 1930's. Since the late 1950's or early 1960's, McKnight has been a vice president of Holly Hill. McKnight and William have also been associated in that they jointly own a citrus grove; together they own all of the outstanding stock of Ridge Citrus Concentrates, Inc.; they were two of the four stockholders of Citrus Enterprises; and they have been two of the three directors of Atlas. Sometime before the trust was created in 1957, S. J. Carter, who is a certified public accountant, *59 became Holly Hill's accountant and tax advisor. He prepared all the tax returns involved in these cases as well as those of the trust. Frank Hickman has been employed for most of his adult life by the the Miami Herald, a daily newspaper in Miami, Florida. He resides in Miami, Florida, at least 200 miles from Haines City, Florida. He does not take part in the day-to-day activities of carrying on the trust which are handled by his brother William. He is the president of Atlas but he does not engage in any day-to-day activities for that corporation. Since January 1960, William has been vice president and treasurer of Atlas. In that capacity, he has kept the financial books and records of Atlas and they have been in his custody and control. At least from August 28, 1957, through the taxable years involved herein, the Hickmans have been two of the three members of the board of directors of Atlas, the other member for at least part of the time being L. W. McKnight. The stockholders and the directors of Atlas did not meet with any degree of regularity and the corporation kept only brief records of such meetings. Atlas owned citrus groves from which it derived income. However, the *60 actual maintenance and operation of the citrus groves that Atlas owned was carried on by Holly Hill, which took care of its groves, picked, hauled, and marketed its citrus fruit. In addition to owning citrus groves, Atlas also held a portfolio of stocks during part of its taxable years involved and also owned bonds and certificates of deposit. The Hickmans sold Atlas most of acreage of citrus groves and all the citrus groves it owned except one, Citrus Grove #12, which consisted of five acres. During the years 1960 through 1964, there was a total of ten sales of real property between Atlas and the Hickmans. In connection with all of these sales, installment notes were given by Atlas, the purchaser, to the Hickmans. The property sold (by grove number), the date of sale, the purchase price, the downpayment, and the face amount of the promissory note are as follows: Purchase
Down
Face Amount
Property Sold
Date
Price
Payment.
of Note
Citrus Groves #17E5 and 17E12
1/15/60
$ 30,000
$3,000
$ 27,000
Citrus Groves #29 (tracts 25 and 26) and 151
1/15/63
105,000
105,000
Citrus Grove #19
1/10/63
162,500
162,500
Citrus Groves #29 (tracts 17 and 32)
12/16/63
32,500
32,500
Citrus Grove #155
12/16/63
52,000
52,000
Citrus Grove #42
12/16/63
21,800
21,800
Grove Lots 31, 51 and 71
12/16/63
8,600
8,600
Citrus Grove #100
12/16/63
57,800
57,800
Citrus Grove #111
12/16/63
52,500
52,500
Citrus Grove #12
5/ 4/64
25,000
25,000
*61 There was no written agreement between Atlas and the Hickmans as to how the payments referred to hereinabove were to be applied as between satisfaction of the principal amount of indebtedness owed and interest thereon. The citrus groves the Hickman's sold to Atlas were subject to the allowance of deductions for depreciation in the hands of Atlas. By letters dated September 8, 1966, Atlas notified the Hickmans that it could not meet the payments called for by the installment notes the Hickmans had obtained from Atlas. By letters dated September 15 and September 16, 1966, the Hickmans agreed to give Atlas more time to make the installment payments due on the notes they held. Pursuant to these letters, the Hickmans and Atlas revised the schedule of payments due on the notes. Atlas made irregular payments on the notes it gave the Hickmans. The payments thereon were not made on time and were made with little regard to the terms of the notes. 1034 In the same taxable year that the Hickmans extended the periods during which the payments on the installment notes were to be made, Atlas purchased $116,488.12 worth of bonds and certificates of deposit. Atlas kept its books and *62 records during all relevant years using the accrual method of accounting and filed its tax returns for all relevant years using the accrual method of accounting. Atlas did not at any time reflect on its books and records interest payable to the Hickmans on the various notes it had given them upon the purchase of citrus groves from them. During the taxable year ended August 31, 1966, Atlas made payments on the various notes it had given to the Hickmans in the total amount of $9,292.53. Such amount was less than the principal due through that date. During its taxable year ended August 31, 1968, Atlas made payments on the various notes it had given to the Hickmans in the total amount of $13,502.53. Such amount was less than the principal due through that date. During its taxable years August 31, 1960, through August 31, 1965, Atlas made payments to the Hickmans, with respect to the various notes given by Atlas to them, in the total amount of $58,826. Atlas, in its return for its taxable year ended August 31, 1968, claimed an investment credit totaling $10,457.48 consisting of $3,817.80 for property acquired in that taxable year and $6,639.68 of carryovers of unused investment *63 credits from taxable years ended August 31, 1964, 1965, and 1966, in the respective amounts of $3,619.54, $806.13, and $2,315.07 for a total $6,740.74 to be reduced by a recapture of $101.06. The respondent, in determining the total amount of investment credit he allowed Atlas in its taxable year August 31, 1968, disallowed investment credit carryovers for Atlas' taxable years ended August 31, 1964, 1965, and 1966. The citrus groves on which the investment credit carryovers were claimed are qualified for the investment credit unless the Hickmans, the persons from whom Atlas acquired the citrus groves, are so related to Atlas that the provisions of sections 48(c)(1), 179(d)(2)(A), and 267(b) and (c) of the 1954 Code prohibit Atlas from claiming an investment credit on those citrus groves. The Atlas stock is not listed on a stock exchange, nor is it traded in the over-the-counter market. Respondent determined that Atlas is entitled to an investment credit for its taxable year ended August 31, 1968, of $3,079.30. The remaining disallowance of investment credit to Atlas for its taxable year ended August 31, 1968, in the amount of $738.50 is not in dispute in this case. Ultimate *64 Finding of Fact The Hickmans as sellers and Atlas as buyer of the citrus groves involved herein are so related within the meaning of sections 48(c)(1), 179(d)(2)(A), and 267(b) and (c) that the Hickmans indirectly own over 50 percent in value of Atlas' outstanding stock. Opinion Respondent determined that Atlas Groves, Inc., is not entitled to deduct investment credit carryovers in the aggregate amount of $7,378.18 claimed on its corporation income tax return for its taxable year ended August 31, 1968, because William and Audrey Hickman, who sold Atlas the citrus groves involved in the investment credit, indirectly owned more than 50 percent of the outstanding stock in Atlas, and hence section 267 of the 1954 Code would be applicable to transactions between them. Atlas, in its return for its taxable year 1968, claimed an investment credit totaling $10,457.48 consisting of $3,817.80 for property acquired in that year and $6,639.68 of carryovers of unused investment credits from taxable years 1964, 1965, and 1966 in the respective amounts of $3,619.54, $806.13, and $2,315.07 for a total of $6,740.74 to be reduced by a recapture of $101.06. Respondent allowed an investment credit *65 in Atlas' taxable year 1968 in the amount of $3,079.30, which is not contested. However, respondent disallowed Atlas' investment credit carryovers of $7,378.18 claimed on its return for the taxable year 1968. The remainder of the disallowance of $738.50 was due to the disallowance of part of the basis of citrus trees acquired during 1968, which Atlas does not dispute. Essentially, it is respondent's position that the Hickmans, the sellers of the citrus trees involved, are so related to Atlas, the purchasers, that sections 48(c)(1), 179(d) 1035 (2)(A), and 267(b) and (c) of the Code [1] preclude Atlas from claiming an investment credit on those trees involved in the carryovers. The Hickmans did not own any Atlas stock but they were the two beneficiaries of the Mary T. Hickman Trust that owned all of such stock. Respondent does not urge that the trust was a sham that should be ignored for trust purposes. However, respondent maintains that the Hickmans owned more than 50 percent of the value of Atlas' stock because they are the only present beneficiaries of the trust and the trust names no specific remaindermen. Petitioners concede that they had constructive ownership of the outstanding *66 stock of Atlas held by the trust within the ambit of section 267(b) and (c), but that if the percent of value of their interest in the stock is computed by actuarial values, or alternatively by the fair market value method, they did not own the required percent under the statute to sustain respondent's position. *67 Respondent's determination is presumptively correct and the taxpayer has the burden to show that he does not come within the ban raised in section 267. See Fincher Motors, Inc., 43 B.T.A. 673, 677 (1941). As applicable here, section 48(c)(1) provides that property shall not be treated as "used section 38 property" if after its acquisition by Atlas it is used by a person who bears a relationship described in section 179 (d)(2)(A) or (B) to a person who used such property before such acquisition, i.e., the Hickmans, who sold the groves to Atlas. Section 179(d)(2)(A) defines purchase so as to exclude from the definition, property acquired from a person whose relationship to the person acquiring it would result in the disallowance of losses under section 267. The pertinent provisions of section 267 dealing with relationships are subsections (b) and (c) thereof as noted in section 179(d)(2)(A). Thus the issue herein is narrowed to the question whether the Hickmans indirectly owned more than 50 percent in value of Atlas' outstanding stock and the method whereby such value is to be computed within the intendment of section 267(b)(2) and (c), supra. Section 267(c) specifically *68 provides for the constructive ownership of stock under the conditions set forth therein in determining whether or not the prohibited relationships set forth therein exist. Among those conditions are: "Stock owned, directly or indirectly, by or for a * * * trust shall be considered as being owned proportionately by or for its * * * beneficiaries." In addition, subsections (c)(2) and (c)(4) provide that an individual is considered as owning the stock owned, directly or indirectly, by or for his family which includes his or her spouse. Thus stock constructively owned is treated as though it is 1036 actually owned Sec. 1.267(c)-1(a)(3), Income Tax Regs.[2]
*69 Consequently, although the Hickmans actually owned no Atlas stock, under the various attribution rules in section 267 (c)(1) and (2), any stock constructively owned by either of them by virtue of their status as beneficiaries of the trust, would be attributed to the other for section 267 purposes. Section 267, in less comprehensive form, was first enacted in the Revenue Act of 1934 (section 24(a)(6)), 48 Stat. 691, and brought to its present form by section 301 (b) of the Revenue Act of 1937, 50 Stat. 827, which enlarged the classes of transactions covered by the statute's prohibition and added rules for determining stock ownership. In essence, this statute was designed to correct what Congress considered the abusive, frequently employed practice of oreating losses for purposes of avoiding the income tax through transactions between certain designated persons and groups. Because of the identity of economic interests of the taxpayers, and the control the taxpayers had over the entities involved, the transfers were usually not thought to result in economically genuine realizations of loss. [3] See McWilliams v. Commissioner, 331 U.S. 694, 699 (1947); Young Door Co., Eastern Division, 40 T.C. 890, 893 (1963); *70 Geiger & Peters, Inc., 27 T.C. 911, 917 (1957); Platt Trailer Co., 23 T.C.1 1065, 1068 (1955). See H. Rept. No. 704, 73d Cong., 2d Sess., 1939-1 C.B. (Part 2) 554, 571; S. Rept. No. 1242, and House Ways and Means Committee Rept. No. 1546, 75th Cong., 1st Sess., 1937-2 C.B. 630. To prevent this tax avoidance, Congress denied deductions of losses on all sales or exchanges between these persons regardless of their subjective intent. Thus, it does not matter that the transactions giving rise to the losses in question were bona fide arm's-length transactions. It is likewise immaterial that an actual loss was suffered. Obviously, if no loss was incurred, the question would not arise. Herbert A. Nieman, 33 T.C. 411, 419 (1959); Frank C. Engelhart, 30 T.C. 1013, 1014 (1958); W. A. Drake, Inc., 3 T.C. 33 (1944), aff'd 145 F. 2d 365 (C.A.1 10, 1944). The test under section 267(b)(2) is expressly stated in terms of value of stock ownership, and the burden is on the taxpayer to prove value of 50 percent or less where he claims this element of the statute is not satisfied. See Jacob M. Kaplan, 21 T.C. 134, 147 (1953). *71 Petitioner, relying strongly upon Rev. Rul. 62-155, 1962-2 C.B. 132 (which was promulgated in determining stock ownership for the purposes of section 421(d)(1)(C) and section 544(a)(1) of the 1954 Code), contends that the Hickmans indirectly own less than 50 percent in value of its stock because their indirect ownership interest must be calculated on an actuarial basis (set forth in Table III of "Actuarial Values for Estate and Gift Tax" in the Code of 1954), depending upon their age at the time they sold the groves in question to Atlas; and that when such computations are used, the value of the Hickman's interest in Atlas' stock is only 49.279 percent in 1966 and less for 1967 and 1968. Briefly stated, petitioners and Atlas argue that section 421(d) (1)(C) relating to employee stock options and section 544(a)(1) dealing with personal holding companies contain language identical to section 267, supra, as far as the trustbeneficiary attribution rules *72 are concerned, and therefore actuarial computations should likewise be used herein to determine the value of the stock owned by the present beneficiaries of the trust and the future beneficiaries (those presently unknown persons who will receive the trust property upon the death of the Hickmans). We recognize that both section 421(d)(1)(C) and section 544(a)(1) provide that stock 1037 owned by a trust shall be considered as owned "proportionately" by its beneficiaries; and in Rev. Rul. 62-155, supra, it is stated, in part, that: in determining stock ownership for the purposes of section 421(d)(1)(C) and section 544(a)(1) of the Code, the shares held by a trust are considered to be owned by its present or future beneficiaries in proportion to their actuarial interests. However, no case interpreting the term "value" in section 267(b)(2) has been brought to the attention of this Court. Nothing in the committee reports or legislative history of section 267 and predecessor sections indicates that the language of section 267 is intended to have a meaning other than that normally implied by the words employed. See Dillard Paper Co., 42 T.C. 588, 590 (1964), *73 affd. 341 F. 2d 897 (C.A. 4, 1965). We do not believe that Congress intended that we should look for parallel terminology in unrelated sections of the Code to ascertain value as used in section 267, supra. The concept of actuarial valuation which petitioner urges upon us is drawn from the context of provisions of the 1954 Code (i.e., sections 421(d)(1)(C) and 544(a)(1), supra), which arise in an entirely different area of the revenue law and were enacted by Congress for a different purpose than section 267. There is no indication in the legislative history of those provisions that a cross-reference of interpretation to section 267 was intended. See McCarthy v. Conely, 341 F. 2d 948 (C.A. 2, 1965), where the Court of Appeals for the Second Circuit refused to apply the language of sections 302 and 346 of the 1954 Code to interpret section 267(b)(2), supra. To the same effect see Commissioner v. Bedford's Estate, 325 U.S. 283, 291-292 (1945), where the Supreme Court rejected a similar contention involving parallel terminology in two unrelated sections of the 1939 Code. In our view, petitioner has not established that the value of the Hickmans' *74 interest in the Atlas stock should be computed by use of actuarial values. Similarly, we find no merit in petitioners' alternative contention that valuation should be made under general valuation principles such as are contained in section 20.2031-1, Estate Tax Regs. It is petitioners' position that the fair market value of the Hickmans' interest in the Atlas stock as defined in these regulations is zero because they cannot sell this interest and because of other limitations upon their beneficial interest according to the terms of the trust agreement. Suffice it to say this regulation does not aid petitioners and has no relevancy here which merits discussion. Section 267(b)(2) specifically provides that 50 percent in value of the outstanding stock can be owned indirectly and subsection (c)(1) provides that stock owned by a trust is considered to be owned by the beneficiaries. These subsections contemplate valuing the stock interest owned by or for an individual, whether outright or in trust for his benefit, without detracting from the value of the stock because it is indirectly owned rather than directly owned. If the section is to apply equally to indirect and to direct ownership, *75 this must be the case. The five shares of Atlas stock in question are worth the same whether directly or indirectly owned because they are valued without regard to how they are owned. In the light of the foregoing and the record as a whole, we sustain respondent's determination with respect to this issue. Respondent, in his reply brief, conceded that the payments the Hickmans received from Atlas in 1966 and 1968 on notes they obtained upon selling citrus groves to Atlas were payments on principal rather than interest. In order to apply consistent treatment to both the Hickmans and Atlas, we hold that interest deductions not be allowed to Atlas for the taxable years involved with respect to such payments. Decisions will be entered under Rule 50. Footnotes
1. SEC. 48(c) Used Section 38 Property. - (1) In General. - For purposes of this subpart, the term "used section 38 property" means section 38 property acquired by purchase after December 31, 1961, which is not new section 38 property. Property shall not be treated as "used section 38 property" if, after its acquisition by the taxpayer, it is used by a person who used such property before such acquisition (or by a person who bears a relationship described in section 179(d)(2)(A) or (B) to a person who used such property before such acquisition). SEC. 179. ADDITIONAL FIRST-YEAR DEPRECIATION ALLOWANCE FOR SMALL BUSINESS. * * * (d) Definitions and Special Rules. - * * * (2) Purchase Defined. - For purposes of paragraph (1), the term "purchase" means any acquisition of property, but only if - (A) the property is not acquired from a person whose relationship to the person acquiring it would result in the disallowance of losses under section 267 or 737(b) (but, in applying section 267(b) and (c) for purposes of this section, paragraph (4) of section 267(c) shall be treated as providing that the family of an individual shall include only his spouse, ancestors, and lineal descendants), * * * SEC. 267. LOSSES, EXPENSES, AND INTEREST WITH RESPECT TO TRANSACTIONS BETWEEN RELATED TAXPAYERS. * * * (b) Relationships. - The persons referred to in subsection (a) are: (1) Members of a family, as defined in subsection (c)(4); (2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual; * * * (c) Constructive Ownership of Stock. - For purposes of determining, in applying subsection (b), the ownership of stock - (1) Stock owned, directly or indirectly, by or for a corporation, partnership, estate, or trust shall be considered as being owned proportionately by or for its shareholders, partners, or beneficiaries; (2) An individual shall be considered as owning the stock owned, directly or indirectly, by or for his family; * * * (4) The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants; * * *↩
2. Sec. 1.267(c)-1. Constructive ownership of stock. (a) In general. (1) The determination of stock ownership for purposes of section 267(b) shall be in accordance with the rules in section 267(c). * * * (3) An individual's constructive ownership, under section 267(c)(2) or (3), of stock owned directly or indirectly by or for a member of his family, or by or for his partner, is not to be considered as actual ownership of such stock, and the individual's constructive ownership of the stock is not to be attributed to another member of his family or to another partner. However, an individual's constructive ownership, under section 267(c)(1)↩, of stock owned directly or indirectly by or for a corporation, partnership, estate, or trust shall be considered as actual ownership of the stock, and the individual's ownership may be attributed to a member of his family or to his partner.
3. Even before the enactment of any applicable statute, a loss on a transfer by a taxpayer to his controlled corporation was not recognized for tax purposes. Higgins v. Smith, 308 U.S. 473, 476↩ (1940).