Robert L. PHINNEY, Appellant,

v.

TUBOSCOPE COMPANY, Appellee.

No. 17376.

United States Court of Appeals
Fifth Circuit.

June 25, 1959.

Rehearing Denied July 24, 1959.

Cameron, Circuit Judge, dissented.

George W. Beatty, Melva M. Graney, Lee A. Jackson, Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Russell B. Wine, U. S. Atty., John E. Banks, Asst. U. S. Atty., San Antonio, Tex., for appellant.

C. W. Wellen, M. S. McCorquodale, Charles W. Hall, Houston, Tex., Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., for appellee.

Before CAMERON, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

We here deal with problems arising under the Korean Excess Profits Tax Statute, as to which others have said, and we have echoed, that this statute " * * probably represented the most intricate and baffling enactment ever to receive Congressional approval." Burford-Toothaker Tractor Co. v. United States, 5 Cir., 1959, 262 F.2d 891.

As we struggle through this intricate web of definitions, exclusions, provisions, exceptions, cross references, limitations, provisos and a general but unavoidable obscurity,[1] it is our conclusion that § 430(e) (2) (B) (i), expressly incorporating § 445(g) (2) (B), impliedly carries with it § 445(g) (3), though not necessarily that portion of § 461 impliedly incorporated by the reference to § 462(g) in § 445(g) (1), so that the attribution rules of § 503(a) (1) (2) (5) makes ownership of the corporate stock by the minor beneficiaries of a trust the ownership of the father, and thus pushes the stock ownership beyond the critical 50 per cent to make thereby a new corporation an old one.

Perhaps this needs some elaboration.

In view of this conclusion we may briefly state the critical facts. Taxpayer is Tuboscope Company, a Delaware corporation incorporated on July 25, 1952. The tax years in question are the fiscal years ending April 30, 1953 and April 30, 1954. On the basis of the jury's special verdict, and judgment entered in Taxpayer's favor, Taxpayer has thus far successfully maintained the contention that it was subject to the 5 per cent rate imposed on new corporations under § 430.

This whole controversy arises because while Tuboscope admittedly was an actual *new* corporation, the Government contends that by the provisions of § 430 (e) (2) (B) (i) what is new in fact is old in tax law since Tuboscope Company acquired substantially all of its assets in August 1952 from Tubular Service and Engineering Company, a Texas corporation, 90 per cent of whose stock was owned by W. H. Hopkins (and wife in community). This is so because by the operation of § 430(e) (2) (B) (i)[2] the

---

1. Not the least of the obscurity comes with trying to find the law, as it is not a part of the Int.Rev.Code of 1954. The Korean Excess Profits Tax Statute, or, "Excess Profits Act of 1950," was enacted January 3, 1951, 64 Stat. 1137, as a part of the Int.Rev.Code of 1939, and only applies to taxable years ending after June 30, 1950, and beginning before January 1, 1954. It is not found by section numbers (§§ 430–474) in the current 26 U.S. C.A. series. However, it is contained in 26 U.S.C. (1952 ed.), and in a special 26 U.S.C.A. volume entitled "Excess Profits Taxes." It also appeared in the 1954 pocket part to the 1945 edition of 26 U.S. C.A. §§ 181–799.

2. Section 430, Imposition of Tax, provides:
   "(e) New corporations
   "(1) Alternative amount. In the case of a taxpayer which commenced business after July 1, 1945, and whose fifth taxable year ends after June 30, 1950, the amount referred to in subsection (a) (3) shall be—
   "(A) If the taxable year is the first or second taxable year of the taxpayer, an amount equal to 5 per centum of the excess profits net income for the taxable year, * * *.
   *   *   *   *   *   *   *
   "(2) First five taxable years. For the purpose of this subsection—

new corporation shall be deemed to have the same age as that of any other corporation which "was a party with the taxpayer to a transaction described in section 445(g) (2) (A), (B), or (C)."[3]

Initially the question is whether Hopkins, admittedly the owner of 90 per cent of the stock of the transferor corporation, Tubular Service, was the owner, directly or indirectly, of more than 50 per cent of the stock of Tuboscope at the time of the acquisition. It is uncontradicted that he was the apparent technical owner of 60 per cent of Tuboscope stock on the date of transfer of assets. The trial below and much of the argument here has centered around the question whether this ownership was in actuality for 60 per cent rather than 15 per cent individually and the remaining

45 per cent for his three minor children in accordance with a prearranged plan. Under this plan the new corporation, Tuboscope, was to be created so that it would be owned 40 per cent by certain key employees of Tubular Service, 15 per cent by Hopkins, and 45 per cent by the three minor children through a trust then being actively formulated under guidance of a Bank, later named Trustee. For our purposes, we may assume that the case permitted the jury verdict and that it and the evidence was sufficient to warrant the judgment so far as non-beneficial ownership of the 45 per cent of the stock by Hopkins at any time. We may do this because, in our view, whether Hopkins owned 60 per cent, as he nominally did for two months' time, or only 15 per cent, the operation of § 503[4] at-

"(A) The taxable year in which the taxpayer commenced business and the first, second, third, and fourth succeeding taxable years shall be considered its first, second, third, fourth, and fifth taxable years, respectively.

"(B) The taxpayer shall be considered to have been in existence and to have had taxable years for any period during which it or any corporation described in any clause of this subparagraph was in existence, and the taxpayer shall be considered to have commenced business on the earliest date on which it or any such corporation commenced business:

"(i) Any corporation which during or prior to the taxable year was a party with the taxpayer to a transaction described in section 445(g) (2) (A), (B), or (C), * * *.
* * * * * * *
Korean Excess Profits Tax Statute § 430, see note 1, supra.

3. Section 445, Average Base Period Net Income—New Corporation, provides:

"(a) New corporation. A taxpayer which commenced business after the first day of its base period shall, except as provided in subsection (g), be considered a new corporation for the purposes of this section, and its average base period net income determined under this section shall be the amount computed under subsection (b).
* * * * * * *
"(g) Ineligible corporations.

"(1) If a taxpayer, on or after December 1, 1950, and prior to the end of its third taxable year, acquires any proper-

ties in any transactions described in paragraph (2), it shall not, for the taxable year in which such acquisition occurs or for succeeding taxable years, be entitled to the benefits of this section except under the circumstances and subject to the limitations provided in section 462(g).

"(2) The transactions to which paragraph (1) applies are as follows:
* * * * * * *
"(B) The acquisition by the taxpayer of a substantial part of its assets from another corporation, or of a substantial part of the properties of another corporation, if 50 per centum or more in value of the outstanding stock or outstanding voting stock of the taxpayer is directly or indirectly owned, at the time of such acquisition, by individuals owning directly or indirectly 50 per centum or more in value of the outstanding stock, or outstanding voting stock of the transferor;
* * * * * * *
"(3) For the purposes of this subsection, the provisions of section 503 shall be applicable in the determination of ownership of stock."
Korean Excess Profits Tax Statute § 445, see note 1, supra.

4. Section 503, Stock Ownership, provides:
"(a) Constructive ownership. For the purpose of determining whether a corporation is a personal holding company, insofar as such determination is based on stock ownership under section 501(a) (2), section 502(e), or section 502(f)—
"(1) Stock not owned by individual. Stock owned, directly or indirectly, by or for a corporation, partnership, estate, or

tributed the 45 per cent of the stock, held in the trust for the three minor children as beneficiaries, to him as their father.

In defense of its judgment, Taxpayer urges that § 430(e) (2) (B) (i), note 1, supra, obviously refers to an "acquiring corporation" and Tuboscope does not meet any of the definitions of that technical term of art set forth in § 461. If Taxpayer is correct on this, we do not get to the question of attribution, and what was a new corporation in fact would, it is conceded, be a new corporation for this tax law. But even if wrong on this, Taxpayer further contends that since § 430(e) (2) (B) (i) refers solely to § 445(g) (2) (A), (B) or (C), set out, note 3, supra, the failure to incorporate § 445(g) (3) must be deemed to have been deliberate and purposeful. Since the portion incorporated expressly by reference (§ 445(g) (2)) makes no mention of the § 503 attribution rules, and these are mentioned only in subparagraph (3) of § 445(g), ownership of the 50 per cent would be determined on ordinary rules of property since no artificial tax law attribution is prescribed. At this point it would be necessary to determine the validity and sufficiency of

the jury verdict and judgment on the nature of Hopkins' ownership of the stock held for the children as of the date of transfer. But as a further and last position in this system of fluid defenses, Taxpayer asserts that even if the attribution rules of § 503, note 4, supra, are incorporated through the operation of § 445(g) (3), the interests of these minor beneficiaries of a skillfully drawn Texas spendthrift trust is so remote that they would not satisfy the statutory status of "beneficiaries" under § 503(a) (1).

We think Taxpayer's first argument is unsound. Section 430(e) (2) (B) (i) does not define the longevity of the new corporation in terms of one which has been an "acquiring" or an "acquired" corporation under § 461. It speaks in terms not of a peculiar status created by a technical tax term of art. Rather it speaks in terms of conduct. The conduct, to be sure, is not spelled out in § 430(e) (2) (B) (i). Like most complex legislation repetition is avoided and accuracy achieved, by the shorthand method of incorporation by reference. The conduct, then, is that spelled out in § 445(g) (2) (B), note 3, supra.

trust shall be considered as being owned proportionately by its shareholders, partners, or beneficiaries.

"(2) Family and partnership ownership. An individual shall be considered as owning the stock owned, directly or indirectly, by or for his family or by or for his partner. For the purposes of this paragraph the family of an individual includes only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.

"(3) Options. If any person has an option to acquire stock such stock shall be considered as owned by such person. For the purposes of this paragraph an option to acquire such an option, and each one of a series of such options, shall be considered as an option to acquire such stock.

"(4) Application of family-partnership and option rules. Paragraphs (2) and (3) shall be applied:

"(A) For the purposes of the stock ownership requirement provided in section 501(a). (2), if, but only if, the effect is to make the corporation a personal holding company;

"(B) For the purposes of section 502 (e) (relating to personal service contracts), or of section 502(f) (relating to the use of property by shareholders), if, but only if, the effect is to make the amounts therein referred to includible under such subsection as personal holding company income.

"(5) Constructive ownership as actual ownership. Stock constructively owned by a person by reason of the application of paragraph (1) or (3) shall, for the purpose of applying paragraph (1) or (2), be treated as actually owned by such person; but stock constructively owned by an individual by reason of the application of paragraph (2) shall not be treated as owned by him for the purpose of again applying such paragraph in order to make another the constructive owner of such stock."

Int.Rev.Code of 1939, § 503. This is not a part of the Korean Excess Profits Tax Statute, see note 1, supra. Section 503 may, therefore, be found in 26 U.S.C. (1952 ed.), and in a special volume of the current 26 U.S.C.A. entitled "Internal Revenue Code of 1939 As Amended."

If the owner of more than 50 per cent of the stock of the transferor corporation is, at the time of the transfer of assets, the owner of more than 50 per cent of the stock of the transferee corporation, then § 445(g) (2) (B) is operative even though the parties to that transaction would not meet the definition of an *acquiring* corporation under § 461.[5]

That being so, the only question is whether Hopkins owned more than 50 per cent of the stock of Tuboscope on the date of transfer. This is the only matter open under § 445(g) (2) (B) as it is undisputed that he owned 90 per cent of the stock in the transferor (Tubular Service) and that Tuboscope obtained substantially all of its assets from Tubular Service.

Nothing is gained by assaying the transaction to determine whether the multiple-step-transaction rule, Kanawha Gas & Utilities Co. v. Commissioner, 5 Cir., 1954, 214 F.2d 685; Georgia-Pacific Corp. v. United States, 5 Cir., 1959, 264 F.2d 161; 3 Mertens, Law of Federal Income Taxation § 20.161, should apply to make the beneficial ownership of 45 per cent of the stock that of the minors by relation back to the date of incorporation if, after so doing, § 503 attribution rules make the children's ownership that of their father. Consequently, the decisive question then becomes whether the attribution rules do apply and if so, to what extent.

Taxpayer's argument is initially beguiling. For, in the atmosphere of the general amorality of tax legislation, all are free to assume that omissions as well as inclusions by Congress are purposeful and articulate. There is little place for judicial construction of the usual type where technical omissions and inaccuracies are construed in a way to effectuate the general policy of the act. Consequently, it is not for us to supply § 445(g) (3), note 3, supra, if express incorporation was necessary merely because Congress made an obvious error of leaving it out. But it is quite a different matter if the intention appears plain that Congress effectually incorporated § 445(g) (3) through the reference to § 445(g) (2).

We think this is what was done. By the peculiar construction of § 445(g) (2) more was incorporated than that set forth in (2) (A), (B) or (C). It states "(2) the transactions to which paragraph (1) applies are as follows: * * *." We need not determine to what extent there is an incorporation of § 445(g) (1) into (2), see note 5, supra. But it is plain from the wording of subparagraph (2) that subparagraph (1) is in some respects included within the incorporation of (2). That means that two

---

**5.** As § 445(g) (1), note 3, supra, does refer in terms to § 462(g), which in turn impliedly incorporates § 461, Taxpayer apparently argues that if § 445(g) (1) is applicable through the express reference to § 445(g) (2), then it means that the standard in § 445(g) (2) (B) is the technical one of an "acquired" corporation. From that it reasons that since the Government's case falls if that is done, the Government must of necessity insist that § 445(g) (1) is in no way impliedly incorporated. Going the next step Taxpayer urges that if (1) is not incorporated impliedly, then neither should § 445 (g) (3) which refers to the attribution rule in § 503. That is, if (3) comes in despite express reference to § 445(g) (2) only, then so should (1). We think that is immaterial, as § 445(g) (2) (B) prescribes its own standard independent of § 461. This is borne out by the legislative history. § 430(e) (2) (B) (i) was originally introduced by the Senate, and the bill passed by the Senate made this section applicable to "Any corporation which is a party with the taxpayer to a transaction described in § 445(g) (2) (whether or not such transaction is described in section 461(a))." H.R. 4473, 82d Cong., 1st Sess., as amended by the Senate and discussed in S.Rep.No.781, Part 2, 82d Cong., 1st Sess., 86. (1951–2 Cum.Bull. 545, 604, 605). The Joint Conference Committee deleted the parenthetical clause adding in its place a reference to § 445(g) (2), "(A), (B), or (C)," the report stating that the amendment was designed to make it clear that § 430(e) (2) (B) (i) "applies without regard to the provisions of § 445(g) (1)." See H.Conf.Rep.No.1213, 82d Cong., 1st Sess. 96 (1951–2 Cum.Bull. 622, 643–644).

such paragraphs, (1) and (2), are thus included, leaving only the one in question, § 445(g) (3). But by the peculiar structure of (3) it is evident that Congress meant (3) to relate automatically either to (1) or (2) or both. If this is not so, then it has no meaning. All subparagraph (3) states is that "(3) for the purposes of this subsection, the provisions of section 503 shall be applicable in the determination of ownership of stock." If subparagraph (3) is to stand on its own unrelated to subparagraph (1) or (2) or both, then it serves no purpose whatsoever because subparagraph (3) does not prescribe any circumstance or situation to which § 503 would be applicable. The phrase "for the purposes of this subsection" as found in subparagraph (3) obviously must mean then that the whole of subsection (g) is referred to. General Retail Corp. v. Commissioner, 1957, 29 T.C. 632, affirmed 6 Cir., 1959, 262 F.2d 591.

■ The result is that we hold that the attribution rules of § 503 applied to the transaction described in § 445(g) (2) (B) and that Hopkins' stock ownership must be judged in the light of the statutory attribution.

As § 503(a) (2), note 4, supra, makes the ownership by children that of the parent, the question then turns on whether the minor children owned this stock. The act is specific for § 503(a) (1) states that "stock owned, directly or indirectly, *by* or for a * * * *trust* shall be considered as being owned proportionately by its shareholders, partners, or *beneficiaries*." (emphasis supplied)

The Taxpayer argues here that Hopkins' three minor children were not "beneficiaries" within the meaning of this statute. Taxpayer argues that the term relates only to those who have a direct present interest in the shares and income in the taxable year concerned and not those whose interest, whether vested or contingent, will or may become effective at a later time. See Steuben Securities Corp. v. Commissioner, 1943, 1 T.C. 395. The Taxpayer emphasizes that the trusts here are irrevocable spendthrift trusts.

The trustee bank has the power to sell the stock. No child is entitled to any income from the trusts until age 21 unless the trustee, in its sole discretion, elects to make a distribution. No trust is to be terminated and distributed until the beneficiary is 25 years old and each of these children was under the age of 10 years at the time of the trust creation.

■ But § 503 does not confine itself to beneficiaries having an immediate and enforceable right. What the status of these three children was, what the intention of the trustors with respect to the trust was is reflected by the trust instrument itself. Under the heading of "Beneficiaries" Article 1 provides "all of the present beneficiaries of these trusts are the children of trustors * * *." And the trustee in traditional language was charged with the duty to "hold, manage, control and dispose of the property of the trust estate solely and equally in separate trusts for the use and benefit of the beneficiaries designated * * *." Nearly every trust for minor children, whether or not written with the emphatic prohibitions of a spendthrift trust, invariably commits the management and distribution to the sole discretion of the trustee with distribution of corpus and income as a matter of right deferred to some specified age after majority. The argument advanced here would exclude all such trusts from the operation of § 503. And the purpose so carefully spelled out in § 503(a) (2) concerning family ownership "directly or indirectly" would be bypassed through the simple expedient of an inter vivos irrevocable trust. The children were beneficiaries. § 503 makes the beneficiary of a trust the owner. The same section makes ownership of the child that of the parent. When that is done, Hopkins had a 60 per cent interest regardless of the time the children's interests became effective or the time of the creation and effectiveness of the trust in their behalf.

■ Since the tax falls and the adjustments and allowances arise from the terms of the tax statute itself, we can-

not, and ought not, be concerned with any supposed intrinsic equities. Technical as are these interwoven sections of the Korean Excess Profits Tax, we do not regard that the inexorable application of these statutes interpreted as we have results in any unexpected or unintended consequence. If it was a new corporation, it was to have a favorable excess profits tax rate. If it was but a continuation of a long existing organization and business, it was not to have this benefit if the creation of the new was through the transfer of substantial properties into a new shell having more than 50 per cent of the same ownership when tested in the light of the economic unity of the family. Tubular Service was a going concern of high earning capacity. All of its assets were transferred to Tuboscope to engage in the same character of work and for which it made fast and substantial profits. The Hopkins family remained the substantial majority stockholders directly interested in its prosperity and growth.

The result is that giving full and absolute credit to the jury finding concerning the purpose and plan of the ownership of 45 per cent of the stock by the minors as beneficiaries of the trust to be established, and crediting all facts in support of the judgment, the Government as a matter of law was entitled to judgment in its favor. No further action being required, the judgment is reversed and rendered.

Reversed and rendered.

CAMERON, Circuit Judge, dissenting.

On Petition for Rehearing

PER CURIAM.

As neither of the Judges who concurred in the opinion is of the view that the petition for rehearing should be granted, it is Ordered that the same be and is hereby Denied; but this order is to make clear that the reversal of the District Court's judgment relates solely to that portion appealed from and before this Court for review.

Denied.