Sam E. WYLY, et al.,
Plaintiffs-Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 80–2138.

United States Court of Appeals,
Fifth Circuit.

Nov. 30, 1981.

Ray, Anderson, Shields, Trotti & Hemp-hill, George E. Ray, Troy Murrell, Dallas, Tex., for plaintiffs-appellants.

Martha Joe Stroud, Asst. U.S. Atty., Dallas, Tex., John F. Murray, Acting Asst. Atty. Gen., Gary R. Allen, Gilbert S. Rothenberg, Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant-appellee.

Before POLITZ and RANDALL, Circuit Judges, and GORDON *, District Judge.

RANDALL, Circuit Judge:

This case presents four issues for review. The first deals with the deductibility to each taxpayer under I.R.C. § 267 of losses on securities sold by the taxpayer to a trust established by the taxpayer's parents for the benefit of the taxpayer's children under the circumstance in which the trust instrument, taken in conjunction with the Texas Probate Code, provides that if all the primary beneficiaries die without issue prior to the termination of the trust, the trust corpus and undistributed income would be paid to the taxpayer, as the heir-at-law of the primary beneficiaries. The remaining three issues concern the constitutionality and deductibility of the minimum tax imposed by I.R.C. § 56 and the classification for purposes of the minimum tax of certain legal and management fees incurred by each of the taxpayers in connection with his invest-ment activities. The district court decided each of these issues adversely to the taxpayers. We affirm.

I.  THE FACTS

On May 28, 1970, the parents (Charles J. Wyly and Flora Evans Wyly) of the taxpayers,[1] Charles J. Wyly, Jr. and Sam E. Wyly, executed the instruments necessary to create two trusts for the benefit of their minor grandchildren. The primary beneficiaries of Trust No. 1 were the four children of Sam E. Wyly; and the primary beneficiaries of Trust No. 2 were the four children of Charles J. Wyly, Jr. Each of these trusts was funded with a $100 payment by the taxpayers' parents. Arty B. Smith, a certified public accountant who served as the taxpayers' family tax advisor and financial consultant, was named as trustee of each of the trusts. On the same day that the trusts were established, the taxpayers sold stock and municipal bonds to the trusts, sustaining some losses as a result. In return, Smith, as trustee, executed promissory notes payable to Sam E. Wyly and Charles J. Wyly, Jr. in the principal amounts of $5,072,077 and $3,460,590, respectively.

Before the trust instruments were executed, Smith sought tax advice from a Dallas law firm concerning the applicability of § 267[2] to the contemplated transactions.

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

1. Since Caroline Wyly and Rosemary Wyly, the wives of Charles J. Wyly, Jr. and Sam E. Wyly, respectively, are parties to this proceeding only by virtue of having filed joint returns with their husbands, Charles J. Wyly, Jr. and Sam E. Wyly will be referred to herein as the taxpayers.

2. I.R.C. § 267, as in effect in 1970, provided in relevant part as follows:

> SEC. 267.  LOSSES, EXPENSES, AND INTEREST WITH RESPECT TO TRANSACTIONS BETWEEN RELATED TAXPAYERS.
> (a) *Deductions Disallowed.*  No deduction shall be allowed—
> (1) *Losses.*—In respect of losses from sales or exchanges of property (other than losses in case of distributions in corporate liquidations), directly or indirectly, between persons specified within any one of the paragraphs of subsection (b).
> . . . .
> (b) *Relationships.*—The persons referred to in subsection (a) are
> (1) Members of a family, as defined in subsection (c)(4);
> (2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual;
> (3) Two corporations more than 50 percent in value of the outstanding stock of each of which is owned, directly or indirectly, by or for the same individual, if either one of such corporations, with respect to the taxable year of the corporation preceding the date of the sale or exchange was, under the law applicable to such taxable year, a personal holding company or a foreign personal holding company;
> (4) A grantor and a fiduciary of any trust;

In a letter dated May 27, 1970, the law firm advised Smith that § 267(b)(6) would not disallow the taxpayers a loss on the sale of securities to the trusts so long as "neither Sam Wyly nor Charles Wyly [Jr.] will have any interest in the trust, either expressly or by virtue of some provision appointing them as remaindermen or some provision providing for distribution to the heirs-at-law of the children. . . ." The firm also advised that § 267(b)(7) would not disallow the loss "[i]f neither Sam Wyly nor Charles Wyly [Jr.] has any interest (either expressly or by virtue of some provision appointing them as remaindermen or some provision providing for distribution to the heirs-at-law of the children) in any other trust of which Mr. Charles J. Wyly, Sr. is a grantor (either because he created the other trust or because he made contributions to the other trust). . . ." Despite this advice, paragraph 4(c) of each of the trust instruments provided that the trust assets would be paid to the heirs-at-law of the taxpayer's children (according to Texas law) if none of the children or their issue were living at the termination of the trust. Section 38(a) of the Texas Probate Code (Tex.Prob.Code Ann. (Vernon 1956)) provides that if a person dies intestate and without issue, his estate will pass "to his father and mother, in equal portions." Thus, each of the taxpayers herein would have been entitled to the corpus and accumulated income of the trust established for the benefit of his children if all of his children had died without issue.

The taxpayers paid Smith's firm in excess of $187,000 in management fees during 1970. The fees were paid for the management, conservation and maintenance of investments held by the taxpayers for the production of capital gain income. Approximately $3,000 of $25,000 in legal fees incurred by the taxpayers during the same period was paid for services incurred in connection with certain federal tax litigation. The balance was paid for the defense by the taxpayers of a stockholders' derivative suit, for securities and tax planning advice and for general legal services incurred in connection with corporate aquisitions for investment purposes.

On his tax return for the year ended December 31, 1970, each of the taxpayers claimed losses with respect to his sale of securities to the trust established for the benefit of his children. As a result of these losses and other deductions, the reported taxable income of each taxpayer was reduced to zero in each instance, although each taxpayer reported minimum tax liabil-

(5) A fiduciary of a trust and a fiduciary of another trust, if the same person is a grantor of both trusts;

(6) A fiduciary of a trust and a beneficiary of such trust;

(7) A fiduciary of a trust and a beneficiary of another trust, if the same person is a grantor of both trusts;

(8) A fiduciary of a trust and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for the trust or by or for a person who is a grantor of the trust; or

(9) A person and an organization to which section 501 (relating to certain educational and charitable organizations which are exempt from tax) applies and which is controlled directly or indirectly by such person or (if such person is an individual) by members of the family of such individual.

(c) *Constructive Ownership of Stock.*—For purposes of determining, in applying subsection (b), the ownership of stock—

(1) Stock owned, directly or indirectly, by or for a corporation, partnership, estate, or trust shall be considered as being owned proportionately by or for its shareholders, partners, or beneficiaries;

(2) An individual shall be considered as owning the stock owned, directly or indirectly, by or for his family;

(3) An individual owning (otherwise than by the application of paragraph (2)) any stock in a corporation shall be considered as owning the stock owned, directly or indirectly, by or for his partner;

(4) The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants; and

(5) Stock constructively owned by a person by reason of the application of paragraph (1) shall, for the purpose of applying paragraph (1), (2), or (3), be treated as actually owned by such person, but stock constructively owned by an individual by reason of the application of paragraph (2) or (3) shall not be treated as owned by him for the purpose of again applying either of such paragraphs in order to make another the constructive owner of such stock.

. . . .

ity. On audit, the Internal Revenue Service (the "Service") disallowed the claimed losses on the sale of the securities pursuant to § 267 and asserted an increase in the minimum tax liability of each of the taxpayers. The taxpayers paid the additional taxes determined to be due, and following denial of their refund claims, brought suit seeking recovery of all the taxes paid by them for 1970.

At trial, the taxpayers made four basic arguments in support of their claim for a refund. First, they argued that § 267 did not operate to bar the deduction of the losses sustained by them in connection with their sales of securities to the trusts. Second, they argued that the minimum tax was unconstitutional and that, consequently, they did not have to pay the minimum tax liability determined to be owing by the Service. Third, they argued that even if the minimum tax was constitutional, the tax constituted a deductible excise tax. Finally, they argued that certain legal and management fees paid in connection with their investment activities should not be deducted from their investment income in determining their minimum tax liability.

The district court rejected each of these contentions. The court held first that the taxpayers were the beneficiaries under the terms of the trusts established by their parents for the benefit of their children and that, as a result, §§ 267(b)(6) and (b)(7) precluded deduction of the losses sustained by the taxpayers when they sold the securities to the trusts. In addition, the district court held that the minimum tax was constitutional and was not a deductible excise tax. Finally, the court concluded that the legal and management fees paid by the taxpayers in connection with their investment activities were required to be subtracted from their investment income for purposes of determining their minimum tax liability. From that decision, the taxpayers bring this appeal.

## II. DEDUCTIBILITY OF LOSSES

■ On appeal, the taxpayers argue that the district court erred in concluding that each of the taxpayers was a beneficiary of the trust established by his parents for the benefit of his children. The taxpayers concede that pursuant to paragraph 4(c) of each trust instrument, there is a remote possibility that the corpus of the trust estate would revert to the taxpayer. Each of the taxpayers points out that in order for this possibility to come to pass, all four of his children would have to predecease him, leaving no descendants. The taxpayers argue that the actuarial probability that this circumstance would occur is very remote, and that such an actuarially insignificant chance should not be used to defeat the deductibility of the taxpayers' losses under the facts of this case. The taxpayers analogize the situation under § 267 to that under I.R.C. § 2055, which allows a deduction for charitable bequests from a decedent's gross estate. If the charitable transfer is dependent upon the performance of some act or the happening of a precedent event in order that it might become effective, no deduction is allowable unless the possibility that the transfer will not become effective is "so remote as to be negligible." Treas.Reg. § 20.2055–2(b)(1) (1958). The taxpayers note that various revenue rulings and judicial interpretations define when a transfer is "so remote as to be negligible" for purposes of § 2055. For example, Rev.Rul. 70–452, 1970–2 C.B. 199, has set forth a 5% test in determining whether an interest is considered so remote as to be negligible. Under this ruling, the charitable remainder interest in an irrevocable trust subject to invasion to make fixed payments to the life tenant is not deductible under I.R.C. § 2055 where the probability that the transfer to the charity will not occur is greater than 5%. The taxpayers also analogize the situation under § 267 to that under I.R.C. § 170, which allows a deduction for charitable contributions made by individuals and corporations. Treas.Reg. § 1.170A–1(e) (1972) provides in relevant part that "[i]f an interest in property passes to, or is vested in, charity on the date of the gift and the interest would be defeated by the subsequent performance of some act or the happening of some event, the possibility of occurrence of

which appears on the date of the gift to be so remote as to be negligible, the deduction is allowable." The Tax Court in Briggs v. Commissioner, 72 T.C. 646 (1979), denied a deduction under § 170 on the ground that the possibility of a breach of one or more conditions subsequent to a charitable transfer and a resulting reentry by the taxpayer-donor did not appear on the date of the gift to be so remote as to be negligible. The Tax Court noted that the phrase "so remote as to be negligible" appearing in Treas.Reg. § 1.170A–1(e) also appears in Treas.Reg. § 20.2055–2(b)(1) and cited Estate of Woodworth v. Commissioner, 47 T.C. 193, 196 (1966), for the definition of the phrase as "a chance which every dictate of reason would justify an intelligent person in disregarding as so highly improbable and remote as to be lacking in reason and substance." Briggs v. Commissioner, 72 T.C. at 657. The taxpayers argue, reasoning from their proposed analogy to the concepts employed under § 2055 and § 170, that the remote possibility that the taxpayers might become beneficiaries of the trusts should not be considered as a reason for invoking the prohibitions of §§ 267(b)(6) and (b)(7).

The taxpayers also argue that the sales were bona fide sales in which complete title to the assets sold was transferred to an independent trustee. The taxpayers note that it is undisputed that the sales occurred at fair market value. They argue that they had a valid business purpose for selling the assets to the trusts, and that after the date of the sales the trustee exercised the exclusive control over the assets. For these reasons, the taxpayers argue that the disallowance of their losses on the sales is not required by the policy underlying § 267.

We agree with the Service and with the district court that § 267 precludes the deductions claimed by the taxpayers in this case. Section 267 provides that an otherwise deductible loss on a sale or exchange of property is not deductible if the transaction is, directly or indirectly, between certain related parties as set forth in subsection (b) of the statute. Insofar as is relevant to this case, the proscribed relationships contained in § 267(b) are as follows:

(6) a fiduciary of a trust and a beneficiary of such trust; [or]

(7) a fiduciary of a trust and a beneficiary of another trust, if the same person is a grantor of both trusts.

Section 267 also provides that in analyzing the various relationships of subsection (b), the constructive ownership rules of subsection (c) must be applied. See note 2, supra.

As this court observed in Merritt v. Commissioner, 400 F.2d 417, 420 (5th Cir. 1968), § 267 was designed to preclude tax losses attributable to sales between members of certain prescribed groups. The rationale behind this rule is that there has been no economically genuine realization of loss when property has been merely "shuttle[d] . . . back and forth between members of a related group in order to acquire the deduction privilege." Id. at 419. Accord, McWilliams v. Commissioner, 331 U.S. 694, 699–700, 67 S.Ct. 1477, 1480–81, 91 L.Ed. 1750 (1947). As noted by the Supreme Court in the McWilliams case, these lost disallowance provisions set forth "an absolute prohibition—not a presumption—against the allowance of losses on any sales between members of certain designated groups." 331 U.S. at 699, 67 S.Ct. at 1480. As explained by the Court:

> The one common characteristic of these groups is that their members, although distinct legal entities, generally have a near-identity of economic interests. It is a fair inference that even legally genuine intra-group transfers were not thought to result, usually, in economically genuine realizations of loss, and accordingly that Congress did not deem them to be appropriate occasions for the allowance of deductions.

Id. (footnote omitted). Thus, contrary to the argument advanced by the taxpayers, it does not matter whether the transaction is bona fide, at arms length, or in good faith with no tax avoidance motive. Whatever the reason, if the proscribed relationship exists, no loss is recognized for tax purposes. As stated by this court in Merritt v. Commissioner, 400 F.2d at 421:

We do not read Section 267 as seeking out devils alone. The basic legislative command of the section is that losses incurred from family transactions are not to be taxable events. This blanket approach relieves the taxing authorities of many complicated and complex melioristic decisions in family transactions. Though we do not applaud harsh results (though defining the result in this case as "harsh" would be no easy task), we recognize that simplicity can be a valid congressional rationale for banning transactions by type.

The district court held that the taxpayers were not entitled to deduct the losses incurred in connection with their sales of securities to trusts established by their parents for the benefit of their children. Under the terms of the statute, this decision is clearly correct. Each of the trust instruments at issue in this case, taken in conjunction with Section 38(a) of the Texas Probate Code, provided that if all the primary beneficiaries died without issue prior to the termination of the trust, the trust corpus and undistributed income would be paid to the heirs-at-law (the father and mother) of the primary beneficiaries. Each taxpayer does not dispute that he was a contingent beneficiary of the trust established for the primary benefit of his children. Under these circumstances, the district court correctly held that no loss could be recognized on the taxpayers' sales of securities to the trusts. Section 267(b)(6) provides that no loss is permitted on the sale or exchange of property between "[a] fiduciary of a trust and a beneficiary of such trust." Section 267(b)(7) similarly provides for the disallowance of a loss on a sale or exchange of property between "[a] fiduciary of a trust and a beneficiary of another trust, if the same person is a grantor of both trusts." Since the taxpayers constituted beneficiaries of these trusts and since the trusts have the same grantor and the same trustee, the sales of securities by the taxpayers to the trustee place the transactions squarely within the loss disallowance provisions of §§ 267(b)(6) and (b)(7).

The taxpayers' argument that they are entitled to avoid the plain language of these loss disallowance provisions by arguing that they had only an actuarially insignificant chance of sharing in any of the trust property must be rejected. There is, in § 267, no language to support the taxpayers' claim that a beneficiary who has only a remote chance of sharing in trust property is not a "beneficiary" of the trust for purposes of § 267. In *Phinney v. Tuboscope Co.*, 268 F.2d 233 (5th Cir. 1959), this court was required to interpret the meaning of "beneficiary" as used in § 503 of the Internal Revenue Code of 1939, 26 U.S.C. (1952 ed.), which contains provisions similar to those set forth in § 267 of the Internal Revenue Code of 1954 (the "1954 Code"). The taxpayer in *Tuboscope* argued that the interest of certain minor beneficiaries of the trust at issue there was "so remote that they would not satisfy the statutory status of 'beneficiaries' under § 503(a)(1)." 268 F.2d at 236. This court rejected that argument, holding that the remoteness of a beneficiary's interest under a trust was simply not relevant under the statute in question. As stated by the court: "§ 503 does not confine itself to beneficiaries having an immediate and enforceable right." *Id.* at 238. The court refused to depart from the plain meaning of the statute as enacted by Congress. While the facts of *Tuboscope* do not directly parallel those of this case, the rule set forth in *Tuboscope*—that a beneficiary of a trust does not cease being a beneficiary merely because of the contingent nature of his interest—is fully applicable here. *See also Hickman v. Commissioner*, 31 T.C.M. (CCH) 1030 (1972) (holding that actuarial considerations applicable in other areas of the tax law play no part in determining the effect of § 267 on a particular transaction).

Contrary to the taxpayer's argument, the "remoteness" rule applicable under §§ 170 and 2055 has no impact on the entirely separate income tax provision set forth in § 267. Neither § 170 nor § 2055 contains a cross reference to § 267 and, in the absence of clear congressional intent to the contrary, there is no justification for interpreting the sections *in pari materia*. In fact,

the existence of the concept of remoteness in §§ 170 and 2055 militates against the notion that a similar concept should be applied in § 267 where no reference is made in the statute to such concept. The congressional failure to insert a "remote contingent interest" rule into the attribution rules of § 267 cannot be considered as merely the product of oversight. We must, therefore, reject the taxpayers' attempt to rewrite § 267 to exclude from consideration beneficiaries which they describe as having an actuarially insignificant chance of sharing in the trust property at some future date.

## III. CONSTITUTIONALITY AND DEDUCTIBILITY OF THE MINIMUM TAX

Approximately $141,000 of the amount that the taxpayers seek to recover represents liability for the minimum tax imposed by § 56[3] of the 1954 Code upon items of tax preference as defined in § 57[4]

3. I.R.C. § 56, as in effect in 1970, provided in relevant part as follows:

SEC. 56. IMPOSITION OF TAX.

(a) *In General*—In addition to the other taxes imposed by this chapter, there is hereby imposed for each taxable year, with respect to the income of every person, a tax equal to 10 percent of the amount (if any) by which—

(1) the sum of the items of tax preference in excess of $30,000, is greater than

(2) the taxes imposed by this chapter for the taxable year (computed without regard to this part and without regard to the taxes imposed by sections 531 and 541) reduced by the sum of the credits allowable under—

(A) section 33 (relating to foreign tax credit),

(B) section 37 (relating to retirement income), and

(C) section 38 (relating to investment credit).

. . . .

4. I.R.C. § 57, as in effect in 1970, provided in relevant part as follows:

Sec. 57. ITEMS OF TAX PREFERENCE.

(a) *In General.*—For purposes of this part, the items of tax preference are—

(1) *Excess investment interest*—The amount of the excess investment interest for the taxable year (as determined under subsection (b)).

(2) *Accelerated depreciation on real property.*—With respect to each section 1250 property (as defined in section 1250(c)), the amount by which the deduction allowable for the taxable year for exhaustion, wear and tear, obsolescence, or amortization exceeds the depreciation deduction which would have been allowable for the taxable year had the taxpayer depreciated the property under the straight line method for each taxable year of its useful life (determined without regard to section 167(k)) for which the taxpayer has held the property.

(3) *Accelerated depreciation on personal property subject to a net lease.*—With respect to each item of section 1245 property (as defined in section 1245(a)(3)) which is the subject of a net lease, the amount by which the deduction allowable for the taxable year for exhaustion, wear and tear, obsolescence, or amortization exceeds the depreciation deduction which would have been allowable for the taxable year had the taxpayer depreciated the property under the straight line method for each taxable year of its useful life for which the taxpayer has held the property.

(4) *Amortization of certified pollution control facilities.*—With respect to each certified pollution control facility for which an election is in effect under section 169, the amount by which the deduction allowable for the taxable year under such section exceeds the depreciation deduction which would otherwise be allowable under section 167.

(5) *Amortization of railroad rolling stock.*—With respect to each unit of railroad rolling stock for which an election is in effect under section 184, the amount by which the deduction allowable for the taxable year under such section exceeds the depreciation deduction which would otherwise be allowable under section 167.

(6) *Stock options.*—With respect to the transfer of a share of stock pursuant to the exercise of a qualified stock option (as defined in section 422(b)) or a restricted stock option (as defined in section 424(b)), the amount by which the fair market value of the share at the time of exercise exceeds the option price.

(7) *Reserves for losses on bad debts of financial institutions.*—In the case of a financial institution to which section 585 or 593 applies, the amount by which the deduction allowable for the taxable year for a reasonable addition to a reserve for bad debts exceeds the amount that would have been allowable had the institution maintained its bad debt reserve for all taxable years on the basis of actual experience.

(8) *Depletion.*—With respect to each property (as defined in section 614), the excess of the deduction for depletion allowable under section 611 for the taxable year over the adjusted basis of the property at the end of the taxable year (determined without regard to the depletion deduction for the taxable year).

## 404

of the 1954 Code. As originally enacted in 1969, the minimum tax was imposed in addition to the regular income tax and was equal to 10% of the amount by which the sum of the items of tax preference in excess of $30,000 was greater than the taxpayer's regular income tax liability (adjusted for certain credits). Included, among other things, within the §57 definition of "items of tax preference" are: (1) "excess investment interest" (*i. e.*, the amount by which investment interest exceeds investment income), (2) accelerated depreciation on certain property, to the extent it exceeds straight line depreciation, (3) the bargain element enjoyed on the exercise of certain qualified stock options, (4) depletion in excess of adjusted basis and (5) that portion of capital gains that is not ordinarily subject to tax.

The constitutional basis of the taxing power is set forth in Article I, Section 8, of the Constitution,[5] which authorizes Congress to impose taxes. Direct taxes, however, must be apportioned among the States according to population (U.S.Const. art. I,

(9) *Capital gains.*—

(A) *Individuals.*—In the case of a taxpayer other than a corporation, an amount equal to one-half of the amount by which the net long-term capital gain exceeds the net short-term capital loss for the taxable year.

(B) *Corporations.*—In the case of a corporation, if the net long-term capital gain exceeds the net short-term capital loss for the taxable year, an amount equal to the product obtained by multiplying such excess by a fraction the numerator of which is the sum of the normal tax rate and the surtax rate under section 11, minus the alternative tax rate under section 1201(a), for the taxable year, and the denominator of which is the sum of the normal tax rate and the surtax rate under section 11 for the taxable year. In the case of a corporation to which section 1201(a) does not apply, the amount under this subparagraph shall be determined under regulations prescribed by the Secretary or his delegate in a manner consistent with the preceding sentence.

Paragraph (1) shall apply only to taxable years beginning before January 1, 1972. Paragraphs (1) and (3) shall not apply to a corporation other than an electing small business corporation (as defined in section 1371(b)) and a personal holding company (as defined in section 542).

(b) *Excess Investment Interest.*—

(1) *In general.*—For purposes of paragraph (1) of subsection (a), the excess investment interest for any taxable year is the amount by which the investment interest expense for the taxable year exceeds the net investment income for the taxable year.

(2) *Definitions.*—For purposes of this subsection—

(A) *Net investment income.*—The term 'net investment income' means the excess of investment income over investment expenses.

(B) *Investment income.*—The term 'investment income' means—

(i) the gross income from interest, dividends, rents, and royalties,

(ii) the net short-term capital gain attributable to the disposition of property held for investment, and

(iii) amounts treated under sections 1245 and 1250 as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231,

but only to the extent such income, gain, and amounts are not derived from the conduct of a trade or business.

(C) *Investment expenses.*—The term 'investment expenses' means the deductions allowable under sections 164(a)(1) or (2), 166, 167, 171, 212, 243, 244, 245, or 611 directly connected with the production of investment income. For purposes of this subparagraph, the deduction allowable under section 167 with respect to any property may be treated as the amount which would have been allowable had the taxpayer depreciated the property under the straight line method for each taxable year of its useful life for which the taxpayer has held the property, and the deduction allowable under section 611 with respect to any property may be treated as the amount which would have been allowable had the taxpayer determined the deductions under section 611 without regard to section 613 for each taxable year for which the taxpayer has held the property.

(D) *Investment interest expense.*—The term 'investment interest expense' means interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment. For purposes of the preceding sentence, interest paid or accrued on indebtedness incurred or continued in the construction of property to be used in a trade or business shall not be treated as an investment interest expense.

. . . .

5. "The Congress shall have power to lay and collect taxes, duties, imports and excises . . . ." U.S.Const. art. I, § 8.

§ 2, cl. 3 & § 9, cl. 4).[6] The Sixteenth Amendment[7] to the Constitution makes the apportionment requirement inapplicable to an income tax. The taxpayers argue that the items of tax preference listed in § 57 are not items of income, but are instead items of capital recovery, capital preservation and unrealized income. Since the minimum tax is imposed on these tax preference items, the taxpayers conclude that the minimum tax cannot be construed as a tax on income. The taxpayers claim that Rev.Rul. 78–61, 1978–1 C.B. 221, in which the Internal Revenue Service addressed the question whether the Ontario Mining Tax was a tax on income (upon which a credit can be taken in the United States), supports their position. *See also* Burke & Malloy, *The Minimum Tax—Is It a Deductible Excise Tax?*, 31 Baylor L.Rev. 9 (1979).

Although the taxpayer's position has a certain surface appeal, we agree with the Service and with the district court that the minimum tax is a tax on income and is, accordingly, constitutional. The statute itself states that the minimum tax is imposed "with respect to the *income* of every person" (emphasis added) and is "[i]n addition to the other taxes imposed in this chapter". The "chapter" referred to in the statute is "Chapter 1—Normal Taxes and Surtaxes," which is a part of Subtitle A of the Internal Revenue Code of 1954 entitled "Income Taxes." Thus, the statutory language supports the Service's position that the minimum tax is a tax imposed upon a taxpayer's income.

But apart from the language of the statute itself, the nature of the minimum tax supports the Service's position that it is a tax on income. As explained in the House Report accompanying the passage of Section 301 of the Tax Reform Act of 1969, the minimum tax was "designed to reduce drastically the ability of individuals to escape payment of tax on economic income." H.R. Rep.No.91–413, Pt. 1, 91st Cong., 1st Sess. 78 (1969–3 C.B. 200, 249), [1969] U.S.Code Cong. & Admin.News, p. 1645, 1725. By imposing, "in addition to the regular income tax," a minimum tax on "tax preference income in excess of the specified exemption" S.Rep.No.91–552, 91st Cong., 1st Sess. 113 (1969–3 C.B. 423, 496), [1969] U.S.Code Cong. & Admin.News, p. 1645, 2144, Congress intended to increase the income tax liability of persons whose regular income tax liability was disproportionately reduced as a consequence of claiming preferential tax treatment allowed with respect to special items of income or deductions. Thus, as explained by the Tax Court in *Graff v. Commissioner,* 74 T.C. 743, 766–767 (1980), although a taxpayer is allowed a deduction for a portion of his long-term capital gains—an item of tax preference—that deduction "is modified in a case of a taxpayer subject to the minimum tax." Similarly, although taxpayers in certain situations are allowed deductions for accelerated depreciation—another item of tax preference—those deductions "are readjusted for taxpayers subject to the minimum tax." *Id.* The minimum tax, therefore, is clearly imposed upon an individual's income, and the fact that it may be more closely tied to "economic," rather than taxable, income does not serve to change this result. *Graff v. Commissioner, id.* at 766; *Kolom v. Commissioner,* 71 T.C. 235, 250 (1978), *aff'd,* 644 F.2d 1282 (9th Cir. 1981).

Although the Supreme Court has not directly addressed the question of the constitutionality of the minimum tax, its recent decision in *United States v. Darusmont,* 449 U.S. 292, 101 S.Ct. 549, 66 L.Ed.2d 513 (1981), is instructive. The specific issue ad-

---

**6.** "Representatives and direct taxes shall be apportioned among the several states which may be included within this Union, according to their respective numbers . . . ."

U.S.Const. art. I, § 2, cl. 3.

"No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken."

U.S.Const. art. I, § 9, cl. 4.

**7.** "The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration."

U.S.Const. amend. XVI.

dressed by the court in that case was whether the 1976 amendments to the minimum tax, which increased its effective rate and broadened its applicability, could be constitutionally applied to transactions consummated during 1976 but prior to the enactment of those amendments on October 4, 1976. In holding that there was no constitutional proscription against applying taxing statutes "retroactively" to the entire year of enactment, the Supreme Court distinguished certain gift tax cases as not "controlling authority with respect to any retroactive feature of a federal *income* tax." 449 U.S. at 299, 101 S.Ct. at 553 (emphasis added). *See also Graff v. Commissioner, supra*, in which the Tax Court specifically held that the minimum tax was a tax on income and that, consequently, it was not subject to apportionment as a direct tax. We conclude, therefore, that the district court correctly held that the minimum tax was not unconstitutional. Further, since the minimum tax represents a tax on income, the taxpayer's argument that it is a deductible excise tax cannot be sustained.

## IV. DEDUCTIBILITY OF MANAGEMENT AND LEGAL FEES

■ The taxpayers paid approximately $187,000 in management fees and $25,000 in legal fees during 1970. The parties stipulated that the management fees were paid for the "management, conservation and maintenance of investments" held by the taxpayers "for the production of capital gain income." The legal fees were paid for services incurred in connection with certain federal tax litigation, for the defense of a stockholders' derivative suit, for securities and tax planning advice and for general legal services related to acquisitions for investment purposes. All of these management and legal fees were deducted by the taxpayers on their tax returns for the year 1970 under § 212 of the Code.

During 1970, one of the items of tax preference subject to the minimum tax was "excess investment interest," which was defined as "the amount by which the investment interest expense for the taxable year exceeds the net investment income for the taxable year." *See* §§ 57(a)(1) and (b)(1) of the Code. Under § 57(b)(2)(A) of the Code, the term "net investment income" referred to in subsection (b)(1) means "the excess of investment income over investment expenses." Section 57(b)(2)(C) completes the definitions by providing that the term "investment expenses" means "the deductions allowable under §§ 164(a)(1) or (2), 166, 167, 171, 212, 243, 244, 245, or 611 directly connected with the production of investment income."

On audit of the taxpayers' returns, the Service determined that these management and legal fees paid by the taxpayers in 1970 in connection with their investment activities were "investment expenses" within the meaning of § 57(b)(2)(C) of the Code. This, in turn, reduced the taxpayers' "net investment income," which, in its turn, increased the amount of interest categorized as "excess investment interest"—an item of tax preference. The end result of treating these management and legal fees as investment expenses under § 57(b)(2)(C) of the Code was an increase in the taxpayers' minimum tax liability.

The district court held that the management and legal fees involved in this case were properly deducted from the taxpayers' investment income for purposes of determining their minimum tax liability.

On appeal, the taxpayers argue that the expenses that are contemplated by § 57(b)(2)(C) are those expenses which bear a direct relationship to the production of investment income. The taxpayers argue that to be an investment expense that is directly connected with a production of investment income, the expense must be of such a character that it could have been forseen that the expense might reasonably result in the production of investment income. Citing *Trust of Bingham v. Commissioner*, 325 U.S. 365, 65 S.Ct. 1232, 89 L.Ed.

1670 (1945), the taxpayers state that it has long been recognized that there are two classes of deductions related to investments: expenses for the production of income; and expenses of management, conservation or maintenance of the property held for the production of income. The taxpayers argue that the expenses at issue in this case are in the latter category and should not have been deducted from the taxpayers' investment income for the purpose of calculating the minimum tax.

We agree with the Service and with the district court that this contention cannot be sustained. Section 57(b)(2)(C) of the Code provides no basis for excluding expenses relating to the management, conservation or maintenance of investment property. The statutory language states specifically that all deductions permitted under § 212 of the Code constitute investment expenses. There is, therefore, no basis for the taxpayers' claim that only expenses described in § 212(1) are includable within the definition of investment expenses. By referring to § 212 in its entirety, § 57(b)(2)(C) does not differentiate between the production of income, on the one hand, and the maintenance and the conservation of income-producing property, on the other hand. By including within the scope of investment expenses items such as state and local property taxes deductible under § 164(a)(1) and (a)(2) of the Code—which can only be described as expenses relating to the maintenance and conservation of property—§ 57(b)(2)(C) makes clear the congressional intention to treat production and conservation expenses equally in determining "investment expenses" for purposes of calculating a taxpayer's minimum tax liability.

By describing investment expenses in § 57(b)(2)(C) as those "directly connected with the production of investment income," Congress was not fashioning a distinction between the production of investment income, on the one hand, and the conservation of income-producing investment property,

on the other. As explained by the Senate Report accompanying the enactment of the minimum tax provisions in 1969, the definitions relating to investment income and expenses were designed to differentiate "investment" activities from "trade or business" activities for purposes of the minimum tax. *See* S.Rep.No.91–552, *supra* at 113–14 (1969–3 C.B. at 496), [1969] U.S. Code Cong. & Admin.News at 2144. In *Trust of Bingham v. Commissioner, supra,* the issue was whether legal expenses incurred for the management and conservation of income producing property were deductible as expenses "for the production of income" within the meaning of § 23(a)(2), of the 1939 Code, the predecessor of § 212 of the 1954 Code. After noting that the scope of the deduction for investment expenses was "comparable and *in pari materia*" to the deduction for trade or business expenses, 325 U.S. at 373, 65 S.Ct. at 1237, the Court held that expenses incurred for the management and conservation of income-producing property were deductible "even though the particular expense was not an expense directly producing income," *id.* at 374, 65 S.Ct. at 1237.

We therefore affirm the decision of the district court that the management and legal fees paid by the taxpayers in this case were properly included as investment expenses directly connected with the production of investment income within the meaning of § 57(b)(2)(C).

AFFIRMED.