W.W. and Mabel P. CARUTH, and
Caruth Corporation, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 3–84–0877–R.

United States District Court,
N.D. Texas,
Dallas Division.

Oct. 20, 1987.

Vester T. Hughes, Jr., David Sinak, David Kent, Cynthia Ohlenforst, Dallas, Tex., for plaintiffs.

Louise P. Hytken, Dept. of Justice, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

BUCHMEYER, District Judge.

This is an income tax case. It involves such exotic tax concepts as the "assignment of income" doctrine, the "economic realities" test, the "step-transaction" analysis, the business purpose requirement, and even an overworked horticultural metaphor.[1]

The plaintiffs are W.W. and Mabel Caruth. In 1978, they were majority stockholders in a closely held corporation, North Park Inn, and they were the sole stockholders of a separate company, the Caruth Corporation. On May 8, 1978, North Park declared a dividend of $1,500 per share—which was payable on May 17, 1978, to those who were shareholders of record on May 15, 1978. This opinion holds:

(i) That the Caruths are not required to pay income tax on the dividends for 1,000 shares of North Park stock which they donated to the Community Chest on May 9, 1978;

(ii) That the Caruths are not required to pay income tax on the dividends for 337.5 shares of North Park stock which they transferred to the Caruth Corporation, their wholly-owned company, on May 5, 1978.

The case was tried without a jury. This opinion constitutes the findings of fact and conclusions of law required by Rule 52, Fed.R.Civ.P.

## I. THE FACTS

In April of 1978, W.W. and Mabel Caruth ("Caruth") owned the following shares of stock of North Park Inn, Inc. ("North Park"), a Texas corporation:

| Class of Stock | Number of Shares Owned | Percentage of Ownership To Total Shares |
|---|---|---|
| Common Stock Class A Voting | 37.5 | 75% |
| Common Stock Class B Non-Voting | 337.5 | 75% |
| Preferred Stock Non-Voting (Callable at $100) | 1,000 | 100% |

The remaining shares of Class A and Class B common stock of North Park were owned by Caruth's nephews, Harold Byrd and Caruth Byrd.[2]

In 1978, Caruth also owned 100% of the shares of the Caruth Corporation—which he had started almost 40 years before (his "first corporation") and which was an active business, with assets that included the Inwood Village Shopping Center in Dallas, a lumber company, a steel company, and two Florida hotels (Plantation Inn and Happy Dolphin Inn).[3]

For some time before April of 1978, Caruth had been thinking about having North Park declare dividends "in order to get money out of" this company. He planned to "wind down" the activities of North Park because the manager of the North Park Inn hotel was "about to die."[4] Ca-

---

**1.** *There is no Rosetta Stone!* Each area of the law has its own language; and each specialty of the legal profession talks in its own unique and often unintelligible jargon. See, e.g., the first three paragraphs of Judge John R. Brown's opinion in *Phinney v. Tuboscope Co.,* 268 F.2d 233, 234 (5th Cir.1959). See also *Lucas v. Earl,* 281 U.S. 111, 115, 50 S.Ct. 241, 241, 74 L.Ed. 731 (1930) for the seeding of the "horticultural metaphor." And see footnote 22.

**2.** North Park Inn was originally named "Hillside Corporation," and was formed by Caruth and his sister to develop the Hillside Village Shopping Center at Mockingbird and Abrams in Dallas, Texas. When they sold Hillside Village, and began to develop a hotel north of down-

town, the name of the corporation was changed to "North Park Inn, Inc." When Caruth's sister died, her 25% of the North Park common stock (Class A and Class B) passed to her two sons, Harold and Caruth Byrd.

**3.** Caruth continued to own 100% of Caruth Corporation until it was liquidated in 1984.

**4.** Later in 1978, North Park did enter into a five-year contract under which Trammel Crow was to manage the hotel from November 17, 1978 to December 31, 1984. Then, the hotel property was sold by North Park to Crow "a couple of years" before the trial of this case (June 1987).

ruth also wanted to buy the North Park shares held by his two nephews, but they had refused—and he hoped he might reach agreement with the nephews after they received a substantial dividend.[5] And, *on April 14, 1978,* Caruth advised the Dallas Community Chest Trust Fund ("Community Chest") that he was "contemplating the gift of a substantial amount" of North Park stock.[6]

At the same time (April of 1978), Caruth was considering a "capital contribution" to the Caruth Corporation, which was having "more and more operations in Florida." Since the North Park operations were being "wound down," that company did not need cash reserves so Caruth knew he could make this "capital contribution" by giving North Park stock to the Caruth Corporation and having North Park declare a dividend.

Caruth did not get any legal advice from a tax specialist about these contemplated transactions. However, Caruth was knowledgeable about their tax consequences—he had an undergraduate degree in accounting and a masters degree from Harvard—and he was also aware of the possible, unfavorable impact of the "accumulated earnings tax" upon the capital reserves of North Park.

This, then, was the basic factual background in which the following events took place:

(i) On May 5, 1978, Caruth transferred his 337.5 shares of North Park Class B common stock (non-voting) to the Caruth Corporation.

(ii) On May 8, 1978, North Park declared a dividend of $1,500 per share, payable on May 17, 1978 to those who were shareholders of record on May 15, 1978.

(iii) On May 9, 1978, Caruth donated his 1000 shares of North Park preferred (non-voting) to the Community Chest.

(iv) On the dividend record date, May 15, 1978, the Community Chest was the shareholder of record of the 1000 shares of preferred stock of North Park; the Caruth Corporation was the shareholder of record of the 337.5 shares of Class B common stock; and Caruth remained the shareholder of record of the 37.5 shares of Class A common stock (voting) of North Park.

On May 17, 1978, the dividend payment date, North Park paid the dividends—which had been declared on May 8, 1978—to the shareholders of record on May 15, 1978. Consequently, the Community Chest received a total dividend of $1,500,000 ($1500 per share for its 1000 shares of North Park stock) ... the Caruth Corporation received a total dividend of $506,250 ($1500 per share for its 337.5 shares) ... and W.W. Caruth received $56,250 ($1500 per share for his 37.5 shares).

Some two months later, on July 26, 1978, the Community Chest sent a letter to Caruth asking if he knew of someone who might buy the 1000 shares of non-voting preferred of North Park stock for the call price, $100 per share. *Caruth had not made any agreement to repurchase this stock when it was donated to the Community Chest.* However, on April 11, 1979, almost nine months after the Community Chest inquiry, Caruth wrote the Community Chest that, since he "didn't know of anyone else who is in the market for this stock and since the company is under my management," Caruth would repurchase the stock himself for $100,000.[7] The 1000 shares of North Park were transferred back to Caruth for this amount.

---

**5.** No dividends had ever been paid by North Park before 1978. None were paid after 1978.

**6.** Caruth had made other contributions to the Community Chest before 1978, including both "publicly held and closely held" stock. His letter of April 14, 1978 (Def. Exh. 5) states that the North Park shares should go to the designated fund bearing his name, "W.W. Caruth, Jr. Fund," which was administered by Community Chest.

**7.** At trial, Caruth (*who was a very credible witness*) testified that the May 1978 dividend by North Park "represented the efforts of twenty years of business activity"—and he knew it would be "a long time before another dividend was paid," so he agreed to repurchase the 1000 shares of preferred stock from the Community Chest for their stated value of $100 per share.

In the Caruth tax return for 1978, the 1000 shares of North Park stock donated to the Community Chest were valued at $1,600,000 ($1,600 per share).[8] The Internal Revenue Service objected, claiming that the dividend income on this stock should be attributed to Caruth because of the "assignment of income" doctrine. The IRS also took the position that the dividend income on the 337.5 shares of stock transferred to the Caruth Corporation should be attributed to Caruth, not to the corporation.[9]

On August 19, 1981, Caruth paid the deficiencies assessed by the IRS for the 1977 and 1978 tax years—$723,790.00 in taxes and $177,392.45 in interest.[10] On December 19, 1981, Caruth timely filed claims for refund of these amounts.[11] These were denied, and on May 31, 1984, Caruth filed this suit for refund of the taxes paid under protest.

## II. THE DONATION OF STOCK TO THE COMMUNITY CHEST

The IRS contends that "assignment of income principles require that [Caruth] be taxed on $1,500,000 of dividend income paid to Community Chest with respect to the

**8.** Because of Internal Revenue Code restrictions on charitable deductions, Caruth was able to deduct only $404,775 of the $1,600,000 contribution for the 1978 tax year. However, he carried the balance forward into subsequent years—and claimed a $844,609 charitable deduction for 1979; a $250,101 deduction for 1980; and a $100,515 deduction for 1981.

**9.** Based on this position, the IRS determined that the Caruth Corporation had *overpaid* its federal income taxes for 1978 by $36,451.00. The suit filed by the Caruth Corporation for refund of this amount was consolidated with the present case. In view of the conclusions reached in this opinion, the Caruth Corporation did not overpay its taxes for 1978, and it is not entitled to any refund for that year.

**10.** The 1977 deficiency involved a separate dispute that has now been settled. In addition, the statute of limitations has run with respect to the 1979 and 1980 returns of Caruth (see footnote 8); the IRS contends that it is "entitled to judicial relief from the statute of limitations of 1979 and 1980"—but that issue is moot in view of the conclusions reached in this opinion concerning the earlier tax years.

**11.** On June 9, 1978, Caruth also filed a "waiver of statutory notification of claim disallowance";

shares of North Park stock that [Caruth] transferred to Community Chest" on May 9, 1979, one day *after* the North Park dividend was declared. It also claims that the "economic realities test" dictates the same result because, after pruning away the corporate formalities, what remains is this: Caruth, as majority stockholder and director of North Park, manipulated the shareholder record date and the date of payment of the dividend, thereby substantially increasing the amount of his charitable contribution for the stock donated to the Community Chest.[12]

The Assignment of Income Doctrine

■ The "assignment of income doctrine" took root in *Lucas v. Earl*, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930); it grew under *Blair v. Commissioner*, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465 (1937) and *Helvering v. Horst*, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940); and it now covers a wide range of transactions.[13] Under this doctrine, the assignment of the right to receive future income—without an accompanying transfer of the underlying asset—will not shift taxability of the income to the transferee.[14]

this started the running of the two year period for filing a suit for refund of the claims disallowed. See section 6532(a)(1). [*Note: All section references are, unless otherwise indicated, to the Internal Revenue Code of 1954, as amended, and in effect for the years in question.*]

**12.** The North Park preferred stock had a $100 per share stated value before the dividend was declared on May 8, 1978, but it had an additional value of $1500 per share after that date because of the dividend. See footnotes 7 and 8. Accordingly, the First National Bank advised the Community Chest that the fair market value of the stock on the day of transfer was $1600 per share. Caruth, in turn, received this appraisal from the Community Chest and valued his charitable contribution at $1600 per share or the 1978 tax return.

**13.** See generally Lyon & Eustice, Assignment of Income: Fruit and Tree as Irrigated by the P.G. Lake Case, 17 Tax.L.Rev. 195, 362 (1962).

**14.** See *Fred W. Warner*, 5 B.T.A. 963 (1926); *Alfred LeBlanc*, 7 B.T.A. 256 (1927); *Overton v. C.I.R.*, 162 F.2d 155 (2d Cir.1947); *see also Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958) (anticipatory

In this case, Caruth donated the 1,000 shares of North Park preferred to the Community Chest one day after North Park had declared the dividend (May 8, 1978), but before the dividend record date (May 15, 1978) or the dividend payment date (May 17, 1978). The IRS argues that, under the assignment of income doctrine, Caruth acquired an irrevocable right to the dividends *when they were declared* because he owned the North Park preferred; and because it was Caruth—acting as North Park director and majority stockholder—who caused the dividends to be declared and paid.

In response, Caruth argues that the transfer of the North Park preferred stock to the Community Chest took place before May 15, 1978, the shareholder record date set by the North Park directors; and that, therefore, when he donated this stock on May 9, 1978, Caruth had no legal right to the dividends, which were not to be paid until May 17, 1978.[15] Accordingly, Caruth maintains that since he had no vested right to the dividends, there was no "assignment of income" when he transferred the North Park preferred stock to the Community Chest—despite the fact that, as controlling shareholder and director, he did determine that the dividends declared on May 8 were

to be paid on May 17 to those who were shareholders of record on May 15, 1978.[16]

The leading case concerning a gratuitous assignment of dividend income is *Estate of Putnam v. Commissioner*, 324 U.S. 393, 65 S.Ct. 811, 89 L.Ed. 1023 (1945). There, the decedent owned stock in several corporations—which had declared dividends *before* his death, but which had set the shareholder record date for determining the recipient of the dividends for a date *after* his death. The issue was whether the dividends had "accrued" to the decedent/taxpayer prior to his death, within the meaning of section 42 of the Revenue Act of 1938,[17] so that the dividends should be included in the decedent's gross income for the year in which he died. The Supreme Court held that the dividends did not "accrue" on the date of declaration because—although the declaration of a dividend fixes the amount to be paid—it "does not determine the distributee. He cannot be known with certainty until the record date." 324 U.S. at 399, 65 S.Ct. at 814.[18]

Moreover, under the *Putnam* rationale, the decedent/taxpayer acquired no *right* to receive the payment upon the declaration of the dividend—this declaration merely created an appreciated value in the stock itself.[19] But, before the record date, the dividend could not be sold at its increased

---

assignment of bond interest taxable to the donor). Cf. *Estate of Stranahan v. C.I.R.*, 472 F.2d 867 (6th Cir.1973) (anticipatory assignment of future dividend income in consideration for the present value of the future dividends held not taxable to the taxpayer's estate).

**15.** See Tex.Bus.Corp.Act Ann. art. 2.26 (Vernon 1985).

**16.** It is axiomatic that "anyone may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934) (Hand, J. Learned), *aff'd* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed.2d 596 (1935). "This is so because 'nobody owes any public duty to pay more than the law demands: taxes are forced exactions, not voluntary contributions.'" *Atlantic Coast Line v. Phillips*, 332 U.S. 168, 173, 67 S.Ct. 1584, 1587, 91 L.Ed. 1977 (1947) (quoting *Commissioner v. Newman*, 159 F.2d 848, 851 (2d Cir.1947) (Hand, C.J. Learned, dissenting).

**17.** Section 42 of the Revenue Act of 1938 states:

The amount of all items of gross income shall be included in gross income for the taxable year in which received by the taxpayer.... In the case of the death of a taxpayer there shall be included in computing net income for the taxable period in which falls the date of his death, amounts accrued up to the date of his death if not otherwise properly includible in respect of such period or a prior period.

**18.** Under *Putnam*, 324 U.S. at 396, 65 S.Ct. at 812, because of a need for uniformity, it is federal—not state—law that determines when a shareholder has realized income from a dividend on his stock.

**19.** See *Brealy & Meyers, Principles of Corporate Finance*, (2d ed. 1984) 45–59. But cf. *United States v. Phellis*, 257 U.S. 156, 171, 42 S.Ct. 63, 66, 66 L.Ed. 180 (1921).

**1134**

value.[20] Only when the right to receive the dividend became personal—*i.e.*, attached to the taxpayer and severable from the shares [21]—did the taxpayer have an unqualified right to payment. See *Avery v. Commissioner*, 292 U.S. 210, 212–215, 54 S.Ct. 674, 675–76, 78 L.Ed. 1216 (1934); *Lucas v. Earl*, 281 U.S. at 114–115, 50 S.Ct. at 241. Therefore, *Putnam* holds that a stockholder does not realize income from a dividend until both the amount of the dividend *and* the distributee are determined.[22] See *Silco, Inc. v. United States*, 779 F.2d 282, 285 (5th Cir.1986).

Although *Putnam* concerned the meaning of the term "accrued" under section 42 of the Revenue Act of 1938, its reasoning does apply to the present controversy.[23] Here, Caruth transferred the North Park preferred *after* the North Park board of directors had declared the dividend, but *prior* to the record date. At the time of this transfer, just as in *Putnam*, the declaration of the dividend set the amount to be paid—but did not fix the identity of the recipient, since this "cannot be known with certainty until the record date." *Putnam*, 324 U.S. at 399, 65 S.Ct. at 814. Therefore, under *Putnam*, Caruth would not realize income from the dividend until both the amount *and* the identity of the stockholder

of record on May 15, 1978 were determined.

Similarly, in *Blair v. Commissioner*, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465 (1937), the Supreme Court held that the assignment of income doctrine could not be applied to a taxpayer who transferred his entire interest in the future income of a trust. The Court reasoned that the taxpayer held an equitable interest in the corpus of the trust and, by the transfer of his right to the trust's future income, he had assigned not merely the right to receive future income, but also his corresponding interest in the trust estate. In other words, the *Blair* taxpayer had transferred the income producing asset itself, and not just the right to the future income that might be generated by this asset.

In this case, Caruth donated all of his shares of North Park preferred to the Community Chest—not merely the future right to the May 17, 1978 dividend. Therefore, just as in *Blair*, Caruth made a *final* disposition of his entire interest in the North Park preferred, including any unmatured right to future dividends.[24] Caruth's right to the dividends to be paid on May 17 had not become unqualified and severable from the underlying stock before the transfer; therefore, under *Blair*, Caruth did not realize income from these dividends, which

---

**20.** Unless the holder of stock upon which a dividend has been declared provides a prospective purchaser of the future dividend with a guaranty that the seller will be the shareholder of record, the attendent risk that the seller will dispose of the stock before the record date—thereby extinguishing the purchaser's right to the dividend—will decrease the price the purchaser would be willing to pay for the right to the future dividend. See *Brealy & Meyers, supra* n. 25, at 1–59. Cf. *Silco, Inc. v. United States,* 779 F.2d 282 (5th Cir.1986) (sale of stock on a national exhange ex-dividend); *Estate of Stranahan v. C.I.R.,* 472 F.2d 867 (6th Cir.1973) (taxpayer's son purchased the taxpayer's right to future dividends for less than their declared value to account for certain risks associated with the time value of money; implicitly, the parties assumed that the taxpayer would remain the shareholder of record).

**21.** *Estate of Putnam v. Commissioner,* 324 U.S. at 400, 65 S.Ct. at 814 ("It is not the earnings of a corporation but the separation of those earnings by a completed dividend which assigns a part of those earnings to a stockholder").

**22.** To sow once more the overworked horticultural metaphor planted by Justice Holmes in *Lucas v. Earl,* 281 U.S. at 115, 50 S.Ct. at 241, the declaration of a dividend amounts to a mere blossom on the tree; it is the shareholders record date, where one is fixed by the board of directors, that creates the ripened fruit for tax purposes. Until then, the declaration of a dividend leaves the identity of the recipient/taxpayer unknown, much like the blossom on a tree admits nothing of the actual fruit to be born.

**23.** See *Silco,* 779 F.2d at 285–286 ("The concept of entitlement is analogous to that of 'accrual' discussed in *Putnam's Estate* ").

**24.** As noted above, when the North park preferred stock was transferred to the Community Chest, Caruth did not have any agreement or understanding that he would repurchase these shares. Caruth so testified, and this Court credits that testimony—particularly since it was supported by the deposition testimony of Edward M. Fjordbak of the Community Chest.

were paid to the Community Chest, the shareholder of record on May 15, 1978.[25] Cf. *Hyman v. Nunan,* 143 F.2d 425 (2d Cir.1944) (transfer held taxable where taxpayer gratuitously assigned to her husband the right to future dividends—but not the underlying stock—two days before the dividend was declared).

In response to *Putnam* and *Blair,* the IRS relies on *Helvering v. Horst,* 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940). There, the taxpayer transferred to his son the interest coupons from a bond owned by the taxpayer. These coupons were negotiable instruments apart from the bond itself; anyone who held the coupons owned a *present* right to future interest income. The Supreme Court held that the taxpayer/donor was taxable on the interest from the coupons in the year in which they came due. The Court reasoned that when the taxpayer purchased the bond, he had acquired two distinct rights: the right to receive the principal amount at maturity, and the right to receive fixed interim interest payments in the future. Thus, the taxpayer had obtained the legal right to demand payment of interest and the power to command its payment to others. *Id.* at 115, 61 S.Ct. at 146. Citing *Horst,* the IRS argues that—although Caruth never received the dividend paid by North Park—he had the right to the dividend as soon as it was declared on May 8, and he derived his "money's worth" through the tax benefits generated by the charitable contribution of the preferred stock to the Community Chest. (See footnotes 8 and 12.)

Contrary to this argument, *Horst* is factually and legally distinguishable from this case. First, Caruth never acquired the right to demand payment of the dividend either to himself or someone else. *Horst,* 311 U.S. at 115, 61 S.Ct. at 146; *Estate of Putnam v. Commissioner,* 324 U.S. at 399–400, 65 S.Ct. at 814–15. Second, Caruth transferred to the Community Chest *both* the preferred stock and all future rights to any income from that stock; the taxpayer in *Horst* transferred only the present right to future income, while retaining the income-producing asset (the bond) for himself. In contrast to the *Horst* taxpayer, Caruth did not retain the power to dispose of the North Park stock after it was transferred or the power to dispose of future dividends which might be paid on that stock. Absent the power to determine the recipient of the dividend, there can be no ownership of it—and without ownership, there can be no realization of income for tax purposes. *Helvering v. Horst,* 311 U.S. at 116–117, 61 S.Ct. at 147; *Blair v. Commissioner,* 300 U.S. at 13–14, 57 S.Ct. at 334; *Lucas v. Earl,* 281 U.S. at 114–115, 50 S.Ct. at 241.[26]

The IRS also relies upon several cases involving the transfer of stock after a corporation has adopted a plan of liquidation.[27]

---

**25.** Before Caruth transferred the North Park preferred to the Community Chest, he was entitled to receive $100 per share for this stock upon liquidation of the corporation. This was a future, potential right—an expectation based upon the terms of the shares themselves. Like these liquidation proceeds, the declared dividend created an expectation of a future payment to Caruth, provided certain other essential events took place—including his ownership of the stock on the dividend record date. If the Internal Revenue laws were construed to tax the expected dividend to be paid after the transfer of the stock, then logically the right to future liquidation proceeds would also be taxable at the time the preferred stock was transferred—despite the fact that Caruth had no unqualified right to receive that money.

**26.** The IRS also argues that Caruth realized economic gain when he disposed of the North Park preferred because he received a charitable deduction, thereby reducing his taxable income. Section 170 rebuts this argument. Congress embodied in section 170 a policy in favor of non-recognition of gain where realization of that gain results from a charitable contribution. See *Carrington v. Commissioner,* 476 F.2d 704, 707 (5th Cir.1973). Even though Caruth obtained a substantial tax benefit by the donation of his North Park preferred to the Community Chest, this public policy—encouraging charitable contributions through non-recognition of economic gain—precludes this theory advanced by the IRS.

**27.** See, for example, *Jones v. United States,* 531 F.2d 1343 (6th Cir.1976); *Allen v. Commissioner,* 66 T.C. 340 (1976); *Kinsey v. Commissioner,* 477 F.2d 1058 (2d Cir.1973); *Hudspeth v. United States,* 471 F.2d 275 (8th Cir.1972). But see *Rushing v. Commissioner,* 441 F.2d 593 (5th Cir.1971).

In these liquidation cases, the taxpayer acquired a *present* right to future liquidation proceeds upon the adoption of the corporation's plan to liquidate; and, although they gave away their stock, the taxpayers had already accrued an unqualified right to receive the liquidation proceeds. Thus, when those taxpayers disposed of their right to the liquidation proceeds, they were required to recognize these liquidation proceeds as income. Accord, *Hort v. Commissioner*, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168 (1941); *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958). However, in this case, at the time North Park declared the dividend Caruth did not acquire an unqualified right to the dividend or the right of absolute disposition. See *Estate of Putnam*, 324 U.S. at 400, 65 S.Ct. at 814. Therefore, the liquidation cases cited by the IRS are distinguishable.[28]

### The Economic Realities Test

■ The IRS makes one additional argument: that the "economic realities" of the transaction require that Caruth be taxed on the $1,500,000 dividend paid by North Park to the Community Chest.[29] *See Helvering v. Gregory*, 69 F.2d at 810–811. In essence, the IRS contends that Caruth's position as the controlling shareholder of North Park—and his dominant position on the North Park board of directors[30]—makes the formal declaration of the dividend, its timing, the contribution of the preferred stock to the Community Chest, and the subsequent payment of the dividend a "sham." Accordingly, the IRS concludes that, because Caruth "manipulated" the shareholder record date and the dividend payment date, the dividend should be taxable income to Caruth, despite the transfer of the stock to the charity. In effect, the IRS argues that the taxpayer caused the fruit to ripen before the tree was cut.

This argument is rebutted by Reg. § 1.61–9(c), which states: "... When a stock is sold between the time of declaration and the time of payment of the dividend, and the sale takes place at such time that the purchaser becomes entitled to the dividend, the dividend is ordinarily income to him...." This language indicates a precise concern for the formalities and timing of a dividend declaration and its attribution to a particular shareholder for tax purposes.[31]

The key term in Reg. § 1.61–9(c) is "entitled," just as the key word in *Estate of Putnam* was "accrued." Further, "[t]he concept of entitlement is analogous to that of 'accrual.'" *Silco*, 779 F.2d at 284.

**28.** The IRS also relies on *Estate of Smith v. Commissioner*, 292 F.2d 478 (3d Cir.1961), which held that a dividend was taxable to a donor/taxpayer who assigned stock to his children after the corporation had declared the dividend. The result in *Smith* depended on the court's determination that the taxpayer had acquired an unqualified right to the dividend at the time of its declaration. This result is not inconsistent with *Estate of Putnam*, as the *Putnam* Court specifically stated that it was not addressing the set of facts present in *Smith*. 324 U.S. at 398, 65 S.Ct. at 813. Indeed, the outcome in *Smith* finds its support in the language of *Avery v. Commissioner*, 292 U.S. 210, 54 S.Ct. 674, 78 L.Ed. 1216 (1934), and *Helvering v. Horst*, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940). *Avery* held that dividends are taxable to a shareholder when "unqualifiedly subject to the [taxpayer's] demand...." 292 U.S. at 214, 54 S.Ct. at 676; *Estate of Putnam*, 324 U.S. at 398, n. 6, 65 S.Ct. at 813 n. 6. Thus, only when a shareholder has an unqualified right to the dividend, thereby exercising control over the power of disposition of the dividend, *Horst*, 311 U.S. at 116–117, 61 S.Ct. at 146–147, does the taxpayer realize income. That was the case in *Smith*, but not here. See *Silco, Inc. v. United States*, 591 F.Supp. 480, 84–2 USTC ¶ 9716 (1984), *rev'd on other grounds*, 779 F.2d 282, 286 (5th Cir.1986) (result in *Smith* depended upon the rule against assignment of income.)

**29.** Justice Cardozo's comment about metaphors is equally applicable to maxims: they "are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it." *Berkey v. Third Avenue Railway Co.*, 244 N.Y. 84, 94, 155 N.E. 58, 61 (1926).

**30.** The plaintiffs W.W. Caruth and Mabel Caruth, together with Almer Clark (the North Park treasurer), constituted the entire board of directors of North Park.

**31.** This is not unlike the situation in *Estate of Putnam*, 324 U.S. 393, 65 S.Ct. 811, 89 L.Ed. 1023, where the issue was whether the decedent/taxpayer's estate should recognize a dividend which was declared prior to his death, but which was payable to a shareholder of record determinable after his death.

Based upon the absence of any prior interpretation of "entitled" in the context of a charitable contribution after the declaration date but before the record date, the analysis of the term "accrued" in *Estate of Putnam,* and the deference to be accorded the language of the regulation, *Silco,* 779 F.2d at 286, the term "entitled" must refer to the time when the holder of the stock acquires an unqualified right to the dividend—a right enforceable against the corporation to compel the payment of the dividend to him. See *id.* at 284 ("entitlement to dividends is fixed solely by corporate title").

Reg. § 1.61–9(c) makes it clear that if the taxpayer *sells,* rather than *donates,* shares of stock after the declaration date—but prior to the record date—the purchaser, not the taxpayer, will be taxed on the dividend. In this case, Caruth had acquired no fixed right against the corporation at the time the dividend was declared; receipt of the dividend depended upon Caruth retaining ownership of the shares until the record date. To suggest, as the IRS does, that a person who contributes shares of stock to a charity and who is accorded non-recognition of the realized appreciation on the stock (see footnote 26), must recognize a dividend over which he has no power of disposition—*when the same person could have sold the stock and, under Reg. § 1.61–9(c), unquestionably avoided recognizing the dividend*—is anomalous, indeed.

Moreover, under this argument, a shareholder who is also a member of the board of directors—and who votes for the declaration of a dividend, but then disposes of his shares before the record date—would have to recognize the dividend attributable to his shares, despite his lack of ownership of the shares and lack of control over the disposition of the dividend on the record date, because he "caused" the dividend by voting for it. However, under the law, it is the timing of the disposition, *vis-a-vis* the declaration and record dates, and not the status of the shareholder, that determines which taxpayer should recognize the dividend.

The fact that Caruth was the controlling stockholder of North Park, and may have known to a certainty the dividend declaration and shareholder record dates, does not change this result. For example, shareholders of utility stocks may know to a certainty when they will become entitled to a dividend; yet, under the IRS argument, the taxpayers' disposition of utility stock prior to the record date would require them to recognize the subsequent dividend because they knew that if they held the stock until the record date they would be entitled to the dividend.[32] This is inconsistent with the regulations, and the law.[33]

In the present case, the law requires that the corporate formalities of dividend declaration and shareholder record date be given legal significance. These dates determined who should recognize the dividends on the North Park preferred stock, and who had merely gained appreciation in value of stock. Where, as here, a taxpayer gratuitously donates to a charity shares of stock in a closely held corporation controlled by him, after the date a dividend has been declared, but before the record date which determines the recipient of the dividend, the taxpayer has not realized any dividend income on the shares contributed—and, therefore, has no dividend income to recognize when the charity receives the dividends.[34]

---

32. Cf. *Silco,* 779 F.2d at 286–287 (addressing the sale of stock ex-dividend).

33. Reg. § 1.61–9(c) does state that "ordinarily" the purchaser would be entitled to the dividend where the stock is sold after the declaration date, but prior to the record date. In the context of the first issue in this case, the term "ordinarily" refers to instances where the record date does not meaningfully determine who is entitled to the dividend. Cf. *Estate of Smith v. Commissioner,* 292 F.2d 478 (3d Cir.1961).

34. Although the parties briefed the question of whether or not the step-transaction doctrine should apply—in light of the subsequent repurchase of the preferred stock from the Community Chest by Caruth—under the facts of this case, that doctrine has no application. See *Dewitt v. United States,* 204 Ct.Cl. 274, 33 AFTR2d 74–1121 (1974); *Behrend v. United States,* 73–1 U.S. T.C. Para. 9123 (4th Cir.1972); see also *Carrington v. Commissioner,* 476 F.2d 704 (5th Cir. 1973); *Grove v. Commissioner,* 490 F.2d 241 (2d Cir.1973). *See also footnote 24.*

## III. THE TRANSFER OF STOCK TO CARUTH CORPORATION

The second issue involves the 337.5 shares of common stock transferred to the Caruth Corporation, the taxpayer's wholly-owned corporation, on May 5, 1978—four days *before* North Park declared a dividend of $1,500 per share payable on May 17 to the record shareholders on May 15, 1978.

The parties agree that section 351 of the Code should determine this dispute concerning the transfer of property to a controlled corporation.[35] However, the IRS—relying, by analogy, upon *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), argues that all transactions undertaken pursuant to section 351—the organization of or the transfer of property to a controlled corporation—like transactions involving the reorganization of a controlled corporation under section 368, must have a "business purpose." *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596. In response, Caruth argues that section 351 protects all transactions which fit within its *express* requirements; and—since section 351 does not expressly require a business purpose—a taxpayer may therefore transfer property to his controlled corporation, without adverse tax consequences, pursuant to section 351 "for good reason, bad reason, or no reason at all".

The "business purpose" doctrine originated in *Helvering v. Gregory*, 69 F.2d 809 (2d Cir.1934), aff'd, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). Under it, a transaction is not to be given effect for tax purposes unless it serves a legitimate business purpose other than tax avoidance. Thus, *Gregory* established the general principle that, in order to fit within a particular provision of the tax code, a transaction must satisfy not only the language of the statute, but also must have a purpose that lies within the spirit of the statute. *Gregory*, 293 U.S. at 470, 55 S.Ct. at 268.

For the following reasons, this Court holds that there must be a business purpose for a transaction under section 351 (just as there must be a business purpose for section 368 transactions under *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596)—but that, at trial, Caruth did in fact establish that there was a business purpose for the transfer of the North Park stock to the wholly-owned company, the Caruth Corporation.

### Section 351 Requires a Business Purpose

■ The starting point for any statutory analysis is the plain language of the provision in question. *Consumer Product Safety Commission v. G.T.E. Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Flora v. United States*, 357 U.S. 63, 65, 78 S.Ct. 1079, 1081, 2 L.Ed.2d 1165 (1958). Section 351 provides that a taxpayer may transfer property to a corporation solely in exchange for stock or securities of that corporation—and recognize no gain or loss on the disposition of that property—so long as he controls the corporation after the transfer.[36] However, like the provisions concerning the reorganization of controlled corporations in section

---

**35.** The relevant language of section 351 states:

(a) General rule.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange of stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.

(b) Receipt of property.—If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock or securities permitted to be received under subsection (a), other property or money, then—

(1) gain (if any) to such recipient shall be recognized, but not in excess of—

(A) the amount of money received, plus

(B) the fair market value of such other property received; and

(2) no loss to such recipient shall be recognized.

(c) Special rule.—In determining control, for purposes of this section, the fact that any corporate transferor distributes part or all of the stock which it receives in the exchange to its shareholders shall not be taken into account.

**36.** Section 368(c) defines "control" as ownership of stock possessing at least 80% of the total combined voting power of all classes of stock entitled to vote and at least 80% of the total number of shares of all other classes of stock of the corporation.

368, section 351 does not *explicitly* require that transfers to controlled corporations have a business-purpose.

Nevertheless, the IRS urges that the purpose of section 351 will be frustrated unless the transactions it covers are required to have a business purpose. This appears to be a case of first impression, and "the duty of this Court is to give effect to the intent of Congress.... Consequently, a thorough consideration of the relevant legislative history is required." *Flora,* 357 U.S. at 65, 78 S.Ct. at 1081; *Helvering v. Hammel,* 311 U.S. 504, 507–511, 61 S.Ct. 368, 369–72, 85 L.Ed. 303 (1941); *Stockwell v. C.I.R.,* 736 F.2d 1051, 1053 (5th Cir.1984); *Caruth v. United States,* 566 F.2d 901, 905 (5th Cir.1978).

The long history of section 351, which begins in 1918, is summarized in Appendix A to this opinion. It reveals that the various corporate "organization" provisions (which preceded section 351) were closely bound to the corporate "reorganization" provisions (like section 368). In promulgating these sections, Congress recognized the economic reality that corporate readjustments do not meaningfully change the identity of the person controlling the transferred property. Indeed, corporate "organization" and "reorganization" transactions were always considered simultaneously by Congress; and for 33 years they occupied the same sections in the code.[37] This legislative history indicates that the principles

governing corporate reorganizations under section 368 should also be relevant to transactions involving controlled corporations under section 351.

The current statutory framework supports this conclusion.[38] Part III of the Internal Revenue Code of 1954 addresses only corporate organizations and reorganizations. Both the organization transactions pursued under section 351 and those involving a plan of reorganization under section 368 rely upon the same basis provisions for the transferor and for the corporation. See sections 358, 362. Where a party to the exchange assumes a liability of the transferor—whether the transferor is an individual or a corporation—or where the transferee acquires property subject to a liability, both sections 351 and 361[39] require reference to section 357 for determination of the tax consequences of the transaction. This scheme of interdependence clearly identifies the nearly uniform economic natures of the organization or transfer provisions under section 351 and the reorganization provisions of section 368.

The overlap between section 351 and section 368 appears evident.[40] Indeed, the potential for simultaneous application of section 351 and the other reorganization definitions to a single exchange has been well documented.[41] In addition, both sections have been subject to two judicially created doctrines the "step-transaction" analysis[42]

---

**37.** Although Congress separated the "organization" and "reorganization" provisions in the Internal Revenue Code of 1954, they still remain in—and comprise the whole of—Part III, entitled "Corporate Organizations and Reorganizations." This part of the code is no larger, substantively, than sections 112, 203, and 202 were before it. Thus, the statutory structure of corporate organizations and reorganizations in Part III of the 1954 Code reflects the fact that these transactions grow out of the same economic seed. *See* H.R.Rep. No. 1337, 83d Cong., *reprinted* in 1954 U.S.Code Cong. & Ad.News 4254; S.Rep. No. 1622, 83d Cong., 2nd Sess., *reprinted* in 1954 U.S.Code Cong. & Ad.News 4901.

**38.** See Appendix A, n. 10.

**39.** Section 361 provides that a corporate transferor is entitled to non-recognition of a gain or loss where it transfers property in exchange for

stock of the transferee pursuant to a plan of reorganization.

**40.** See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 14.16 (Supp. No. 2 1984) (section 351 applies concurrently to type "D" reorganizations); Rev.Rul. 78–130, 1978–1 CB 144 (overlap of section 351, and type "C" and "D" reorganizations).

**41.** See Bittker & Eustice, *supra* n. 40, at ¶ 3.19; Rev.Rul. 70–433, 1970–2 CB 82 (overlap between "B" reorganization and section 351); Rev.Rul. 76–188, 1976–1 CB 99 (overlap between section 351 and "C" reorganization).

**42.** The step-transaction doctrine holds that all steps in a single transaction should be amalgamated to determine the true nature of a transaction. Although the scope of the test is somewhat vague, its purpose is to ensure that the

and the "continuity of interest" test.[43]

And, the Supreme Court has recognized the close relationship between a corporate organization and reorganization. In *Helvering v. Cement Investors*, 316 U.S. 527, 62 S.Ct. 1125, 86 L.Ed. 1649 (1942), the Court stated:

> Sec. [351] and the reorganization provisions [section 368] are rather closely related. [Citations omitted.] While the "reorganization" provisions are restricted to inter-corporate transactions, § [351] is not so confined, since the phrase "one or more persons" includes "individuals, trusts or estates, partnerships and corporation." [Citation omitted.] But there is no indication that the "reorganization" provisions were designed as the exclusive method of deferring recognition of gain or loss in all cases of corporate readjustments or reorganizations. The history of § [351] makes clear that it too was designed to function in that field.... Its legislative history shows that it was designed to permit "readjustments" without present recognition of gain or loss by allowing property to be transferred to a controlled corporation by an individual, a partnership, a corporation, or others [citations omitted].... In short, the "reorganization" provisions do not furnish the exclusive methods for securing a deferment of gains or losses arising out of transactions popularly known as corporate readjustments and reorganizations. The instant transaction comes fairly within the *family of business readjustment* for

which § [351] was designed. (316 U.S. at 533–34, 62 S.Ct. at 1128–29.)

*Cf. Davant v. C.I.R.*, 366 F.2d 874 (5th Cir.1966), and *Reef v. C.I.R.*, 368 F.2d 125 (5th Cir.1966).

For these reasons, it seems clear that section 351 and the reorganization provisions (of section 368) are cumulative, and not mutually exclusive. See *Helvering v. Cement Investors*, 317 U.S. at 533–534, 62 S.Ct. at 1128–1129; *Bard–Parker Company v. C.I.R.*, 218 F.2d 52, 57 (2d Cir.1954); *Barker v. U.S.*, 200 F.2d 223, 229 (9th Cir.1952); *Britt v. Commissioner*, 114 F.2d 10, 13 (4th Cir.1940). Therefore, the business purpose requirement should be applied to section 351, just as it has been applied to section 368. *Helvering v. Gregory*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596.

This conclusion is supported by several cases which *imply* that a business purpose is required for a section 351 transfer. For example, in *Hempt Bros., Inc. v. United States*, 490 F.2d 1172 (3d Cir.1974), the question was whether the assignment of income doctrine might supercede the non-recognition provision of section 351. In concluding that the doctrine did not apply, the court was "influenced by the fact that the subject of the assignment was accounts receivable for partnership's goods and services sold in the regular course of business, that *the change of business form from partnership to corporation [pursuant to section 351] had a basic business purpose and was not designed for the purpose of deliberate tax avoidance....*" *Id.* at 1178 (emphasis added). Although the *Hempt Bros.* court did not directly hold that an

---

steps taken by a taxpayer have economic substance, and are not merely formal acts that constitute part of a unitary plan to escape taxation. See *Security Indus. Ins. Co. v. United States*, 702 F.2d 1234 (5th Cir.1983). See also Regs. § 1.351–1(c)(5); Rev.Rul. 70–140, 1970–1 CB 73; Rev.Rul. 68–349, 1968–2 CB 143; *see also Earl Vest*, 57 TC 128 (1971), *modified on other grounds*, 481 F.2d 238 (5th Cir.), *cert. denied*, 414 U.S. 1092, 94 S.Ct. 722, 38 L.Ed.2d 549 (1973); Bittker & Eustice, *supra* n. 40, at ¶ 3.02.

**43.** The continuity-of-interest doctrine ensures that the shareholders of a transferor corporation or the individuals organizing a corporation retain a continuing interest in, and continue

participating in, the corporation's control, earnings, and assets. See *Southwest Natural Gas Co. v. Commissioner*, 189 F.2d 332 (5th Cir.), *cert. denied*, 342 U.S. 860, 72 S.Ct. 88, 96 L.Ed. 647 (1951). This doctrine was the result of the judiciary's effort to ensure the proper application of the organization and reorganization provisions. *See* n. 58, *ante* at 33. See also Rev.Rul. 80–284, 1980–2 CB 117; Rev.Rul. 80–285, 1980–2 CB 119; Rev.Proc. 81–10, § 3.01(20), 1981–1 CB 647, superceded by Rev.Proc. 82–22, 1982–1 CB 469, and by Rev.Proc. 83–22, 1983–13 IRB 73; *see also Parkland Place Co. v. United States*, 354 F.2d 916 (5th Cir.1966); Bittker & Eustice, *supra* n. 59, at ¶ 3.05.

exchange under section 351 requires a business purpose, it clearly indicated that these types of corporate readjustments are governed by the same principles that apply to reorganizations. See also *Stewart v. C.I.R.,* 714 F.2d 977 (9th Cir.1983); *Moline Properties v. Commissioner,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943).

Therefore, the transfer of property to a controlled corporation must, under section 351, have a business purpose.[44] Indeed, the opposite conclusion "would result in permitting the § [351] exemption to be used as a device for evading taxes Congress intended to impose on many gains actually realized...." *Commissioner v. Fisher,* 327 U.S. 512, 513, 66 S.Ct. 686, 90 L.Ed. 818 (1946). Accordingly, in this case, Caruth was required to prove that there was a business purpose for the transfer of the North Park common stock to the Caruth Corporation.

### There Was a Business Purpose for the Transfer

■ Whether or not Caruth did have a business purpose in transferring the North Park stock to a wholly-owned Company, the Caruth Corporation, is a question of fact. See *United States v. Cumberland Public Service Co.,* 338 U.S. 451, 456, 70 S.Ct. 280, 282, 94 L.Ed.2d 251.[45] The trial evidence presented by the plaintiffs on this issue was simple, but convincing.

The Caruth Corporation had been in business for over 40 years. In 1978, its assets included the Inwood Shopping Center, a lumber company, a steel business, and two hotels in Florida. In contrast, Caruth testified that the activities of North Park were being "wound down."[46] Since North Park did not need capital reserves—and since the Caruth corporation was having "more and more operations in Florida"—Caruth wanted to make a "capital contribution" to the Caruth Corporation by the transfer of the North Park stock.

Accordingly, on May 5, 1978, the 337.5 shares of North Park common were transferred to the Caruth Corporation as a "capital contribution"—and that corporation received the $506,250 in dividends on May 17, 1978. Caruth testified that this provided the Caruth Corporation with additional funds for its business operations,[47] and that it also increased the assets of the Caruth Corporation and its ability to borrow money should the need arise.[48]

The Caruth Corporation continued in business, and continued to own the North

---

**44.** The argument that Congress would have inserted a business purpose requirement in section 351 if it had intended one is not convincing. Since *Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), Congress has recodified the reorganization provisions once in 1954, and amended section 368 nine times. Never in these 10 opportunities did Congress insert an express business-purpose requirement in section 368. However, no one would challenge the fact that, despite this inaction by Congress, the requirement still exists for reorganizations under section 368. *Helvering v. Gregory,* 293 U.S. 465, 55 S.Ct. 266, 78 L.Ed. 596.

**45.** In the case of a closely-held corporation, no distinction is to be drawn between a "shareholder purpose" and a "corporate purpose" when deciding whether or not there is a "business purpose" for the transaction. *Lewis v. C.I.R.,* 176 F.2d 646, 649 (1st Cir.1949); see also *Davant v. C.I.R.,* 366 F.2d at 880.

**46.** In fact, the management of the North Park Inn was contracted to Trammel Crow in November of 1978, and he subsequently bought the North Park property from Caruth. See footnote 4.

**47.** The quarterly financial reports of Caruth Corporation from 1977 through 1979 (Pl.Exh. 15), the minutes of Caruth Corporation from 1977 through 1979 (Pl.Exhs. 8–10), and Caruth's testimony did establish that the Caruth Corporation was using substantial amounts of capital in its own day-to-day operations, as well as in supporting the losses of the two Florida hotels.

**48.** Caruth was not as clear during his deposition; indeed, the IRS contends that he testified then that he had forgotten the business purpose of the transfer of the North Park stock to the Caruth Corporation. However, at trial, Caruth's testimony regarding the business purpose for this transaction was clear and convincing—and this Court credits that testimony because Caruth was a very credible witness. The Court also credits Caruth's testimony that the declaration of the North Park dividend was motivated by these business reasons for the transfer of stock to the Caruth Corporation, as well as for the hope of eliminating the minority stockholders in North Park. See footnote 2.

Park stock, until it was liquidated in 1984. And, there was no evidence that the Caruth Corporation was a meaningless, shell corporation which was merely being used for tax avoidance purposes. See, e.g., *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); *Chisolm v. Commissioner*, 79 F.2d 14, 15 (2d Cir.1935); *Commission v. Smith*, 136 F.2d 556, 559 (2d Cir. 1943). See also *Hallowell v. Commissioner*, 56 T.C. 600 (1971).

It is true, as the IRS contends, that the evidence *did not* show that the Caruth Corporation was on the brink of financial disaster or that a significant capital contribution was essential to the corporation's survival. However, Caruth did not need to prove either of these circumstances in order to establish that there was a business purpose for the transfer of the North Park stock to the Caruth Corporation.[49] Indeed, if this were the test, then the only shareholders who would be able to demonstrate a business purpose under section 351 for capital contributions to controlled corporations would be those whose corporations were unsuccessful or were near bankruptcy.

Therefore, Caruth did establish—as required by section 351—that there was a business purpose for the transfer of the North Park stock to the wholly-owned company, the Caruth Corporation.

## CONCLUSION

For these reasons, this Court concludes that (i) Caruth is not required to pay income tax on the $1,500,000 in dividends for 1000 shares of North Park which were donated to the Community Chest; and (ii) Caruth is not required to pay income tax on the $506,250 in dividends for the 337.5

---

**49.** Nor does the argument by the IRS that "the Caruth Corporation had ample working capital without the dividend from the North Park stock" change the fact that Caruth's testimony did establish that there was a business purpose for the transfer of the stock. See footnotes 47, 48.

**1.** In relevant part, the bill read:

---

shares of North Park which were transferred to the Caruth Corporation.

## APPENDIX A

The history of section 351 begins in 1918. In that year, the Senate Finance Committee proposed a bill outlining certain non-taxable events, including corporate organizations and reorganizations.[1] S.Rep. No. 617, 65th Cong., 3d Sess. 5–6 (1918). The bill provided that no gain would be recognized where a person transfers property to a corporation in exchange for stock of the corporation formed to take over the property. *Id.* Its purpose was to establish a rule for determining taxable gains "in the case of certain purely paper transactions." S.Rep. No. 617, *supra.*

The Conference Committee struck from the proposal the language "relating to corporations formed to take over the property of individuals," but left intact the reorganization language. H.R.Con.Rep. No. 1037, 65th Cong., 3d Sess. 44–45 (1918). Congress adopted the amended provision as section 202(b) of the Revenue Act of 1918. 40 Stat. 1057.

Although the Conference Committee removed from the final version of the bill the reference to transfers of property by individuals to corporations, the legislative history indicates that the Senate considered reorganizations and incorporations nearly indentical in nature, and worthy of the same tax treatment.

In 1921 the House changed its position on corporations formed to succeed individuals. In considering amendments to section 202(b) of the Revenue Act of 1918, in connection with the Revenue Act of 1921, 42 Stat. 227 (1921), the House Ways and Means Committee stated:

> When in connection with the reorganization, merger, or consolidation of a corporation a person receives in place of stock or securities owned by him new stock or securities of no greater aggregate par or face value, *or when a person or persons owning property receive in exchange for such property stock of a corporation formed to take over such property,* no gain or loss shall be deemed to occur from the exchange....(emphasis added)

"[p]robably no part of the present income-tax law has been productive of so much uncertainty and litigation or has more seriously interfered with those *business readjustments* which are peculiarly necessary under existing conditions. . . .

"The preceeding amendments, if adopted, will, by removing a source of grave uncertainty, not only permit business to go forward with the *readjustments* required by existing conditions but will also considerably increase the revenue. . . ."

H.R.Rep. No. 350, 67th Cong., 1st Sess. 7–8 (1921) (emphasis added).

The report also noted that the only exception to the general rule favoring taxation of exchanges of property under section 202(b) of the Revenue Act of 1918 is when—in connection with a reorganization, merger, or consolidation of a corporation—a taxpayer exchanges shares of stock in a corporation for new shares in that corporation of no greater aggregate or par value. *Id.* The House then offered four other "similar transactions in which it is difficult to determine the gain or loss in the absence of an actual sale and which should be *treated in the same manner* in connection with the reorganization, merger, or consolidation of a corporation. . . ." *Id.* (emphasis added).

The "four classes of transactions . . . urged as proper additional exceptions to

the general rule" of recognition of taxable exchange were these:

1. When the market value of the property received cannot be satisfactorily determined.

2. When property is exchanged in return for all or substantially all the stock of a corporation.

3. When property is exchanged between corporations affiliated within the meaning of section 240.

4. When in connection with the reorganization of a corporation or partnership, one corporation or partnership exchanges property with another corporation or partnership involved in such reorganization, or a person receives in place of stock or securities owned by him new stock or securities.

*Id.* The opinion of the Ways and Means Committee reflected the Senate's 1918 position; and the Senate reiterated its position in a 1921 report by the Senate Finance Committee. S.Rep. N. 275, 67th Cong., 1st Sess. 11–12 (1921).

As part of the Revenue Act of 1921, the Conference Committee adopted section 202(c)(3).[2] H.Rep. N. 486, 67th Cong., 1st Sess. 17–18 (1921). It provided that no gain would be recognized where a person, or persons, transfer property to a corporation, and immediately after the transfer own at least 80 percent of the voting stock, and at least 80 percent of the total number of shares of all other classes of stock of the corporation.[3] *Cf.* section 351.

**2.** Section 202(c)(3) provided, in pertinent part, that no gain or loss shall be recognized when: (A) a person transfers any property . . . to a corporation, or (B) two or more persons transfer any . . . property to a corporation, and immediately after the transfer are in control of such corporation, and the amounts of stock, securities, or both, received by such persons are in substantially the same proportion as their interests in the property before such transfer. For the purposes of this paragraph, a person is, or two persons are, "in control" of a corporation when owning at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

**3.** It must be noted that the original proposal by the House Ways and Means Committee regarding section 202(c)(2) of the Revenue Act of 1921

—which provided for the non-recognition of gain on the exchange of stock or securities by the taxpayer pursuant to a reorganization—allowed for the non-recognition of exchange gain "[w]hen in the *organization* or the reorganization of one or more corporations a person receives in place of any such property stock or securities owned by him, new stock or securities in a corporation a party to or resulting from such reorganization. . . ."

In conference the House acceded to a Senate amendment and deleted from section 202(c)(2) the reference to the "organization" of a corporation. This was done not because the Senate believed it improper to accord corporate organizations the same treatment as reorganizations, but because the Senate believed that corporate organizations by individuals were sufficiently covered by proposed section 202(c)(3). Indeed, the Senate Finance Committee Report states

The statutory scheme for corporate organizations and reorganizations beginning to take form by 1921 reflected the separate but equal approach by Congress to individuals and corporations. Each class of taxpayers had its own section describing incorporation; but both shared the basis provisions for shares received from the new corporation and property transferred to the corporation. *See* section 202(d)(1) of the Revenue Act of 1921 (where no gain or loss is recognized on an exchange of property "under the provisions of subdivision (c)" of section 202, the property received shall take the basis of the property which is given up).

In 1924 Congress amended the organization and reorganization provisions. It revised the definition of a reorganization to include "a common type of reorganization," H.R.Rep. No. 179, 68th Cong., 1st Sess. 16 (1924), used "in the advance of business .... [and also] to prevent the use of the reorganization section to escape proper tax-action." 65 Cong.Rec. 2429 (1924) (statement of Rep. Green). Section 203(h)(1) now defined the term "reorganization."[4] The Act of 1924 provided non-recognition treatment for a transfer of property by a corpo-

ration to another corporation if, immediately after the transfer, the transferor or its stockholders or both controlled the transferee corporation. With this change, Congress had enacted the corporate analogue of section 202(c)(3) of the Revenue Act of 1921.[5] Once again, the economic similarity between organizations and reorganizations was reflected in the tax code.

Furthermore, Congress enacted new section 203(b)(3) of the Revenue Act of 1924 to provide for the non-recognition of gain or loss where a corporation exchanged property for stock or securities in another corporation and both corporations were parties to the reorganization.[6] Given that a reorganization now included transfers of property to corporations by other corporations which owned at least 80 percent of the voting stock, and at least 80 percent of the total number of shares of all other classes of stock of the transferee—and given the preference of Congress for dividing corporate and non-corporate transactions—section 203(b)(3) of the Revenue Act of 1924 amounted to no more than the corporate equal of the organization provisions provided for individuals who chose to organize a corporation.[7]

that the types of transactions requiring non-recognition treatment included the formation of corporations by *individuals*. The Committee assumed that the reorganization provisions in section 202(c)(2) covered those situations where a corporation—rather than an individual—organized a new corporation.

The Senate Finance Committee Report characterized these organizations and reorganizations as "corporate readjustment[s]." S.Rep. No. 275, *supra*. Thus, in substance and effect, the corporate organization provisions of section 202(c)(3) were to individuals what the reorganization provisions of section 202(c)(2) were to corporations.

**4.** The substantive amendment read: "The term 'reorganization' means ... (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred."

**5.** In the Revenue Act of 1924, Congress redesignated section 202(c)(3) of the Revenue Act of 1921 as section 203(b)(4) of the Revenue Act of 1924.

**6.** Unlike section 202(c)(3) of the Revenue Act of 1921—which included in its language the me-

chanics of the transaction—new section 203(b)(3) of the Revenue Act of 1924 only provided that non-recognition would attend readjustments where property was exchanged for stock by corporations which were parties to the same reorganization. To determine whether a reorganization had taken place, reference had to made to section 203(h)(1). As the definition of a reorganization was incorporated by reference into section 203(b)(3), it was in effect the corporate reflection of section 203(b)(4)—the corporate organization section.

**7.** In the Revenue Act of 1924 Congress enacted several new sections concerning corporate readjustments. *See* sections 203(d), (f) of the Revenue Act of 1924. Congress provided that certain transactions which might otherwise satisfy the requirements for non-recognition treatment—but which included other property or money not permitted to be received under the relevant statutes—were required to recognize any realized gain up to the amount of the other property received. Significantly, Congress made no distinction between transactions involving corporations engaged in a reorganization and transactions involving persons undertaking a corporate organization. In substance, Congress perceived no difference between the underlying economic

In the Revenue Act of 1934, 48 Stat. 680 (1934), Congress again amended the Internal Revenue Code.[8] During debate, the House Ways and Means Subcommittee recommended "[t]hat the exchange and reorganization provisions contained in section 112 of existing law be abolished ... [to] close the door to one of the most prevalent methods of tax avoidance." H.R.Rep.Dec. 4, 1933, 73d Cong., 2d Sess. 8 (1934). The subcommittee listed the several transactions accorded non-recognition treatment, which included the sub-sections covering persons who transferred property to a controlled corporation and the reorganization exceptions. The subcommittee criticized the favorable treatment provided for *all* of the different transactions—not just reorganizations. However, it did report that the underlying purposes of section 112 and its subsections were:

(1) That such provisions prevent much of the uncertainty and litigation which was involved under the prior income tax laws;

(2) *Normal business adjustments* will not be interferred with if so-called paper profits are exempted; and

(3) The revenues of the government will be increased by preventing taxpayers from taking colorable losses.

*Id.* at 38 (emphasis added).

The full House Committee and the Senate Finance Committee [9] disagreed with the recommendation that all of section 112 should be struck from the tax code. In compromise, the Conference agreed that amending section 112 would be a wiser policy. The amendments would allow for continued non-recognition of an exchange or reorganization where "required in order to strengthen the financial condition of the

corporation." H.R.Rep. No. 704, 73d Cong., 2d Sess. 14 (1934).

That Congress specifically addressed the evils of, and reconsidered the benefits of, both corporate organizations and reorganizations appears evident from their choice of exclusive terms: exchange and reorganization. Furthermore, the House Ways and Means Subcommittee Report referred specifically to the sub-section on corporate organizations and spoke equally to both organizations and reorganizations.

While the Subcommittee submitted that all organization and reorganization sections should be jettisoned from the tax code, the full House Committee and the Senate Finance Committee retained those provisions with certain modifications. The House and Senate Committees found that the potential for tax avoidance should be eliminated from the scope of both the organization and reorganization provisions, and that legitimate transactions executed to improve the condition of the corporation should remain protected.

Following the recommendations of the Ways and Means Committee and the Senate Finance Committee, Congress left intact section 112 and modified the definition of a reorganization to reflect the economic realities of transfers of property to corporations. Congress premised its decision to leave both the organization and reorganization provisions in the Revenue Act of 1934 on a common, underlying economic rationale: to provide for legitimate corporate transfers pursued to strengthen the financial condition of the corporation—and not to avoid taxes.[10]

This legislative history demonstrates that the various corporate "organization" provisions which preceded section 351 were

---

purpose and effect of corporate organizations and reorganizations.

**8.** Congress earlier recodified the Revenue Act of 1924 in the Revenue Act of 1928. 45 Stat. 791 (1928). Section 203(b) was redesignated section 112. The 1928 Act made no relevant substantive changes to the organization and reorganization provisions—only technical changes.

**9.** *See* S.Rep. No. 558, 73d Cong., 2d Sess. 16 (1934).

**10.** Congress recodified section 112 in the Internal Revenue Code of 1954, 26 U.S.C. § 1 et seq., as sections 351 (transfer to a corporation controlled by transferor); 354–358 (effects on shareholders and security holders); 361–362 (effects on corporations); 367–368 (special rule; definitions). *See also* section 1031, 26 U.S.C. § 1031 (like-kind exchanges of property).

closely bound to the corporate "reorganization" provisions which preceded section 368; that these corporate "organization" and "reorganization" provisions were considered simultaneously by Congress; and that Congress recognized the economic reality that corporate readjustments do not meaningly change the identity of the person controlling the transferred property.[11]

---

**11.** This legislative history *does not* give any weight to any "signing statements" made by any president when these various tax laws were signed. *See* Marc N. Garber and Kurt A. Wimmer, *"Presidential Signing Statements As Interpretations of Legislative Intent: An Executive Aggrandizement of Power,"* 24 Harv.J.Legis. 363–95 (1987).